John L. ROSE, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–499.

District of Columbia Court of Appeals.

Argued Oct. 13, 1992.
Decided Aug. 5, 1993.

Suzanne D. Sager, Washington, DC, appointed by the court, for appellant.

Thomas R. Eldridge, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Abby Stavitsky, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN, SCHWELB and WAGNER, Associate Judges.

FERREN, Associate Judge:

After his convictions for distribution of cocaine and possession with intent to distribute, D.C.Code § 33–541(a)(1) (1988 Repl.), appellant seeks review of the trial court's denial of his motion to suppress tangible evidence and an out-of-court identification. He argues that the trial court should have excluded this evidence because the police obtained it as a result of a warrantless entry into his aunt and uncle's apartment. The government replies that appellant lacks standing to object to the warrantless entry. We conclude that the record requires us to hold that appellant has standing. It follows on this record—as

the government concedes—that the evidence must be suppressed.[1]

## I.

According to the government's evidence,[2] the circumstances of appellant's arrest were as follows. At about 6:00 p.m. on May 1, 1990, Officer Rene Davis of the Metropolitan Police Department, working undercover, saw appellant come out of an apartment building and walk toward another at 3253 23rd Street, S.E.[3] Officer Davis signalled to appellant that she wished to purchase rock cocaine. Appellant motioned to her to approach. Officer Davis did so and asked appellant if she could buy two $20 pieces of rock cocaine. Officer Davis and appellant then went into the 23rd Street apartment building where, on the landing between the second and third floors, the officer gave appellant $40 in prerecorded bills in exchange for two plastic bags of rock substances. While this transaction was taking place, a door opened to apartment 24 on the second floor, and a woman asked appellant if he wanted her to leave the door unlocked. He said no. Officer Davis then asked appellant whether he would still be there if she came back in five minutes, to which appellant replied that he would either be "out here" or in the apartment where the woman was. He also told Officer Davis that, because he had a key, he did not know why the woman had asked him if he wanted her to leave the door unlocked. Officer Davis then returned to her car and radioed to an arrest team,

reporting that she had just made a drug purchase and describing the seller[4] and where he could be found.

Two members of the arrest team, Officer Calvin Jones and Sergeant Joseph Zovak, then entered the apartment building and, not seeing the subject in the hallway, knocked at the apartment indicated by Officer Davis. According to Officer Jones, a woman[5] answered the door, and Sergeant Zovak announced that they were police officers looking for a suspect in relation to a narcotics offense. There is no indication in the record that the officers ever obtained or displayed a warrant either to arrest appellant or to search apartment 24. Officer Jones testified that the woman opened the door, stepped back, and said "Okay," admitting the officers into the apartment. As the officers crossed the threshold, they saw appellant walking into the living room. They approached appellant, detained him, and patted him down, finding nothing. They then escorted him outside the apartment to the street, where Officer Davis, riding by, identified appellant as the person who had sold her the cocaine. Appellant was placed under arrest, and Officer Green, the transport officer, searched him, finding a ziplock bag containing a piece of rock cocaine in appellant's pants pocket.

Appellant did not testify at trial, but at the suppression hearing he gave the following account. After returning home from work he had gone to the store. On his way back from the store he passed by his aunt's

---

1. Appellant also contends that the trial court erred in failing to respond to a note from the jury, and that this lack of response improperly coerced the jury into returning a guilty verdict on the charge of possession with intent to distribute. Because we reverse on other grounds, we do not reach this issue.

2. In reviewing the denial of appellant's suppression motion, we consider both the evidence offered at the suppression hearing and the undisputed trial testimony. *See Martin v. United States,* 567 A.2d 896, 902 n. 16 (D.C.1989), *appeal after remand,* 605 A.2d 934 (D.C.), *cert. denied,* — U.S. —, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992).

3. It appears from the record that Officer Davis was working on the 22nd Street side of the building but that the actual address of the build-

ing in question, as given by appellant and his uncle, is 3253 23rd Street.

4. Specifically, Officer Davis described the seller as follows:

Black male, medium to dark complexion, blue baseball cap with a white patch and his hat was turned around backwards, white short sleeve shirt over top of a black sweat jacket, what looked like a black sweat jacket and blue pants.

5. Sergeant Jones admitted, however, that in the report he filled out on the day of the arrest, he had written that "S–1" (appellant) had answered the door.

apartment at 3253 23rd Street on the 22nd Street side; she was in the window and asked him for a cigarette. Appellant went up to her apartment and began talking with his aunt and uncle there. Appellant stated that he did not make it "a habit" to go over to his aunt's, but he did "check on" his uncle and aunt "once or twice a week." A minute or thirty seconds after he arrived at the apartment there was a knock on the door. Appellant testified that he opened the door and that police officers appeared with handguns and shotguns. The officers did not display any warrant, nor did they request permission to enter the apartment, although they did identify themselves as police. They pushed their way inside the apartment, and one man grabbed appellant by his shirt, shoved him up against a wall, proceeded to search appellant's pockets and socks, and then opened and dropped appellant's pants. One of the officers told appellant he was not under arrest but asked him to walk outside. The officer then escorted appellant outside the apartment building while holding onto him by the back of his pants.

Appellant's uncle, Samuel Rose, testified both at the suppression hearing and at trial. He said that he lives with his sister Betty Jean Mack, appellant's aunt, at 3253 23rd Street, S.E. He added that appellant visited the apartment every other day, or once or twice a week. Rose also testified that he visited appellant at the home of appellant's mother, where appellant lived. Rose confirmed that appellant had opened the door when there was a knock and that the police officers then rushed in, pinned appellant against the wall, and searched him, dropping appellant's trousers.

The trial court denied appellant's suppression motion. The court credited appellant's testimony that appellant, not a woman (as Officer Jones had testified), had answered the door when the police knocked. The court did not make any find-ing as to whether appellant or anyone else had consented to the officers' entry into the apartment. The court did find, however, that the "combination of [the] description [given by Officer Davis] as well as the physical location [was] more than enough to establish probable cause." The court also found that there were exigent circumstances, not in the sense that there was imminent danger, but insofar as the police needed to prevent destruction of evidence and make an identification, because "the police don't know who this guy is." The court ruled that under these circumstances the police, upon seeing appellant across the threshold, had probable cause or at least reasonable suspicion that justified taking . appellant into custody. Moreover, the court "seriously question[ed] the [appellant's] having any standing about being hauled out of his aunt's home under those circumstances," although the court did not make a formal finding as to whether appellant had standing to object to the warrantless entry. Finally, the court concluded that even if there had been an unlawful arrest, the subsequent identification procedure was not tainted because the undercover officer had had plenty of opportunity to observe appellant.

## II.

### A.

We note at the outset that on appeal the government has abandoned any claim that the detention and search of appellant in his aunt and uncle's home was justified by exigent circumstances, as the trial court ruled. Nor has the government renewed on appeal its claim, which the trial court did not address, that everyone concerned had consented to the warrantless entry.[6] Furthermore, the government acknowledged at oral argument that if appellant had standing to challenge the officers' warrantless—and thus illegal[7]—entry, then

---

**6.** The government argued at the suppression hearing that the entry was consented to, but the motions judge made no finding on this question. While appellant argued lack of consent on appeal, the government did not address the issue either in its brief or at oral argument. That issue, therefore, is no longer in the case.

**7.** See *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (absent exigent circumstances, Fourth Amendment prohibits

the subsequent seizure and ride-by identification of appellant, as well as the plastic bag of cocaine found upon appellant, would be tainted by the illegality of the entry and thus would have to be suppressed.[8] The government, therefore, has chosen to rest its argument in support of the trial court's ruling solely on the proposition that appellant lacked standing to object to the officers' warrantless entry.[9]

As we noted above, the trial court did not make factual findings or explicitly rule on the issue of appellant's standing. The trial court's failure to consider appellant's standing in more detail, however, may have been due, at least in part, to the government's failure to contest standing at the outset. Although appellant, in his motion to suppress, alleged that he had "standing to challenge the legality of the entry," the government's opposition did not contest standing. Indeed, the government did not even mention standing until the prosecutor did so briefly in oral argument at the end of the suppression hearing. Defense counsel at that point indicated she had understood the government was conceding the issue—an understanding that may have caused counsel to fail to present additional evidence.

■ The question, then, is whether we can rule on the standing issue on this record. In principle, of course, the trial court—not the appellate court—finds facts. But this court may rule on the standing issue as a matter of law, even if the trial court has not made essential findings of fact, if the evidence of standing is sufficient and uncontroverted. *See Martin v. United States*, 567 A.2d 896, 902 (D.C. 1989), *appeal after remand*, 605 A.2d 934 (D.C.), *cert. denied*, —— U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). That is the

case here. Before looking at the evidence, however, it is necessary to inform the analysis by reference to the applicable law.

### B.

■ Standing to object to a search or seizure as a violation of constitutional rights "depends on whether the person claiming the protection of the Fourth Amendment 'has a legitimate expectation of privacy in the invaded place.'" *Lewis v. United States*, 594 A.2d 542, 544 (D.C. 1991) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992). "'A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable.'" *Id.* (quoting *Minnesota v. Olson*, 495 U.S. 91, 95–96, 110 S.Ct. 1684, 1687–88, 109 L.Ed.2d 85 (1990), omitting other citations and internal quotation marks). Such an expectation need not be limited strictly to the confines of a person's home, temporary or otherwise, in order to be reasonable. *See Olson*, 495 U.S. at 96 n. 5, 110 S.Ct. at 1688 n. 5.

■ In *Martin*, 567 A.2d at 902–03, we concluded that a part-time resident of his grandparents' home had a protected privacy interest in that home. More recently, the Supreme Court held in *Olson* that an overnight guest had a legitimate expectation of privacy in the premises, sufficient to give him standing to challenge a warrantless entry and arrest. We did not intend our ruling in *Martin*, nor do we understand the Supreme Court's holding in *Olson*, to mean that overnight guest status, at the very least, is a *sine qua non* of standing to challenge a search or seizure in a residence other than one's own home. It remains

---

warrantless, nonconsensual entry by police into felony suspect's home).

**8.** The government has not contested suppression in the event we conclude that appellant has standing to raise that issue. In its brief on appeal, the government has written: "Although we believe that this Court's decision in *Bryant* [*v. United States*, 599 A.2d 1107 (D.C.1991),] may be distinguishable, in this appeal, we do not contend that the 'ride-by' identification evi-

dence is admissible without regard to whether the warrantless entry and seizure of appellant in the apartment was lawful."

**9.** The government further contends that, assuming appellant lacked standing to challenge the warrantless entry, appellant's Fourth Amendment rights were not otherwise violated. Given our disposition of the standing issue, we do not reach this question.

true, of course, that in order to establish standing to challenge a search or seizure, a visitor in another's home bears the burden of showing that the visitor had a reasonable expectation of privacy in that home. *See Prophet v. United States,* 602 A.2d 1087, 1091 (D.C.1992). But being an overnight guest is not the sole means by which a guest may satisfy that burden.[10] In this case, therefore, we cannot say as a matter of law that appellant lacked standing to object to the officers' warrantless entry simply because he never claimed that he had been an overnight guest in his aunt and uncle's apartment.

 There is other evidence in the record sufficient to establish that appellant had a reasonable expectation of privacy in the premises. First, it is uncontested that this apartment was the home of appellant's close relatives, his aunt and uncle. Second, appellant testified, and his uncle confirmed, that appellant regularly visited his aunt and uncle—"once or twice a week." This, again, is uncontested. Third, the government sponsored testimony by Officer Davis, both at the suppression hearing and at trial, that appellant said he had a key to

the apartment.[11] Neither at trial nor at the suppression hearing did the government attempt to negate or qualify that statement through further questioning of Officer Davis, appellant, or appellant's uncle. We recognize, of course, that the statement is hearsay, but since it was admitted in evidence without objection or qualification by the government, a court may consider it and accord it full probative value.[12] Given the facts that the government sponsored this testimony twice, and that there is no contrary evidence, we conclude that the only reasonable inference to be drawn from this evidence is that appellant indeed had a key to the apartment.

Furthermore, the fact that the apartment belonged to appellant's close relatives, coupled with the facts that he was a regular visitor and had a key, compel any reasonable finder of fact to infer that appellant had his aunt's and uncle's permission to enter the apartment as he wished, day or night, that he could therefore expect to use it as a place of refuge, and that appellant was in a position to admit or exclude someone from the apartment.[13] Appellant's sta-

10. Our decisions in *Prophet* and *Lewis* are not to the contrary. While it is true that we used the "overnight guest" criterion in rejecting appellants' standing claims in both of those cases, we did not need to consider other means of establishing a reasonable expectation of privacy because appellants failed to advance any other legitimate basis for their claims. Lewis was only a party guest who took a nap in a bedroom where other partygoers were coming and going. *See Lewis,* 594 A.2d at 544, 546. Prophet had only been in the home of a friend for about three or four minutes when the police arrived. *See Prophet,* 602 A.2d at 1089, 1091.

11. At the suppression hearing, Officer Davis, the undercover agent who purchased drugs from appellant, testified as follows:
 I told him [appellant], I said, well, if I come back where are you going to be. And he says, I'm going to be—if I'm not right out here, I'll be in that apartment where that girl is at. I said, okay, I can just come right up there, and he said, yes. He said, I'm going right back up there now. I have a key, I can get in, you know, I don't need her to leave the door unlocked. I don't know why she [the woman who had opened the apartment door, presumably appellant's aunt] is asking.
 At trial Officer Davis essentially repeated the same testimony:

I said, "I'll probably be back." So, he said, "I'll either be out here or in that apartment you saw that girl come out of." He said, "I don't know why she asked me if I wanted her to lock it. I have got a key. I can get back in."

12. *See, e.g., Mack v. United States,* 570 A.2d 777, 782 (D.C.1990) (" 'Hearsay evidence admitted without objection may be properly considered by the trier of fact and given its full probative value.' " (quoting *Alston v. United States,* 509 A.2d 1129, 1131 n. 9 (D.C.1986))); *Bullock v. United States,* 243 A.2d 677, 678–79 (D.C.1968) ("The weight of authority in this country, and in this jurisdiction, is that hearsay testimony to which no objection is made may be properly considered along with other evidence in determining the facts."); J.A. Bock, Annotation, *Consideration, in Determining Facts, of Inadmissible Hearsay Evidence Introduced Without Objection,* 79 A.L.R.2d 890 (1961 & Supp.1990, 1992).

13. The dissent questions whether the record compels an inference that appellant had an unrestricted right to use his key to enter the apartment as he wished. *See Post* at 543–544. We have no hesitation in concluding that when a nephew is a regular visitor, and has a key, to his aunt and uncle's apartment, the burden of producing evidence that the key had a restricted

tus in his aunt and uncle's home, therefore, was considerably more than that of a casual visitor, distinguishing his situation from that of a mere party guest, as in *Lewis*, or that of an adolescent visiting the home of one of his friends, as in *Prophet.* `See supra` note 10.

Taken together, these three factors—appellant's close kinship with the owners of the apartment, his regular visits, and his possession of a key—generate essentially the same expectations the Supreme Court found in the situation of an overnight guest:

> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The house-guest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away ..., the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest.

*Olson*, 495 U.S. at 99, 110 S.Ct. at 1689.[14] We therefore conclude that appellant had a subjective expectation of privacy in the premises that was reasonable and legitimate; consequently, he has standing to move for suppression of the evidence attributable to the warrantless entry.

Given the government's concession that the evidence must be suppressed if appellant has standing to make the motion, *see supra* note 8 and accompanying text, we

must reverse the judgments of conviction and remand for a new trial, if the government so desires, without the tangible and identification evidence attributable to the warrantless entry.

## III.

Because our dissenting colleague reaches the merits issue, we feel obliged to say more fully why we believe this court ought not to do so.

### A.

In appellant's brief, counsel first argued lack of exigent circumstances (the basis for the trial court's ruling validating the warrantless entry). The government, in its answering brief, said "it does not renew the exigent circumstances argument on appeal." Appellant's counsel then argued lack of consent. The government did not reply, either in its brief or at oral argument. *See supra* note 6. Finally, appellant's counsel contended that the police lacked probable cause, or even reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to seize appellant until after the police had illegally entered the Rose apartment without a warrant. It follows from this illegal entry, said appellant's counsel, that under *Bryant v. United States*, 599 A.2d 1107 (D.C.1991), the identification evidence and the later-seized cocaine should have been suppressed. The government elected not to challenge appellant's *Bryant* analysis and thus, for purposes of this appeal, effectively conceded the suppression motion in the event we were to rule appellant had standing to argue it. *See supra* note 8.

The government's only merits argument, therefore, assumed that appellant lacked

---

use shifts to the party opposing the nephew's assertion of a legitimate expectation of privacy in that apartment. The government has not proffered any such evidence.

**14.** *See also Rakas,* 439 U.S. at 149, 99 S.Ct. at 433, observing that in the earlier case of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), Jones had a legitimate expectation of privacy insofar as

> Jones not only had permission to use the apartment of his friend, but had a key to the

apartment with which he admitted himself on the day of the search and kept possessions in the apartment. Except with respect to his friend, Jones had complete dominion and control over the apartment and could exclude others from it.

In *Rakas,* the Supreme Court rejected the "legitimately on premises" standard for determining standing, previously adopted in *Jones,* as too broad, but it did not question the conclusion that the defendant in *Jones* had standing. *Rakas,* 439 U.S. at 141–42, 99 S.Ct. at 429–30.

standing to challenge the warrantless entry. *See* Appellee's Brief at 26. The government accordingly argued that the seizure of appellant in the apartment was not unlawful, very simply, because the police, upon seeing appellant, at least had reasonable suspicion under *Terry* to seize, remove, and detain him for identification, after which they had probable cause to arrest, search, and seize cocaine from him. The government, therefore, has not presented this court with the difficult question whether, despite a warrantless entry by the police, the identification and drug evidence should be admitted in evidence under *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), or instead, because of the warrantless entry, the evidence should be suppressed under *Bryant* (a case distinguishing *Harris* ).[15]

### B.

▪ Our dissenting colleague argues that we should go ahead and address the *Harris/Bryant* issue on our own. Fundamentally, Judge WAGNER relies on a line of cases in which the government confesses error and joins in an appellant's request for reversal of a criminal conviction.[16] When that happens, as this court put it long ago, we cannot set aside the conviction "on confession of error alone"; the "public interest prevents shifting the responsibility for reversal from the appellate court to the prosecuting official." *Fletcher v. United States*, 49 A.2d 88, 88 (D.C.1946) (citing *Young v. United States*, 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942), and *Parlton v. United States*, 64 App.D.C. 169, 75 F.2d 772 (1935)). In such a case, this court will decide the appeal based on our independent review of the merits after "a thorough examination of the record." *Id.; see Turner v. District of Columbia*, 98 A.2d 786, 787 (D.C.1953); *Dowell v. United States*, 87 A.2d 630, 631 (D.C.1952); *Hainsworth v. District of Columbia*, 72 A.2d 776, 777 (D.C.1950).[17]

▪ This approach is unremarkable. Indeed, we take the same position whenever

---

15. Although the government noted in its concession that *"Bryant* may be distinguishable," *see supra* note 8, the government did not say *Bryant* "was" distinguishable. For all we can tell, therefore, the government relied solely on the standing argument not merely because it thought it should prevail on that issue but also because it believed that lack of standing was its only winning argument—*i.e.*, that if appellant had standing to challenge the warrantless entry, his *Bryant* argument for suppression was sound.

16. *See, e.g., Young v. United States*, 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942); *Turner v. District of Columbia*, 98 A.2d 786 (D.C.1953); *Dowell v. United States*, 87 A.2d 630 (D.C.1952); *Hainsworth v. District of Columbia*, 72 A.2d 776 (D.C.1950); *Fletcher v. United States*, 49 A.2d 88 (D.C.1946); *Parlton v. United States*, 64 App.D.C. 169, 75 F.2d 772 (1935); *Cachoian v. United States*, 452 F.2d 548 (5th Cir.1971); *Georges v. United States*, 262 F.2d 426 (5th Cir.1959).

17. The premise underlying this approach is a belief, traceable to old English caselaw, that the court's reliance on a government confession of error would establish a legal precedent embracing appellant's argument and that the court, not the prosecutor, should be the institution performing the evaluative function that announces the law. *See Parlton*, 64 App.D.C. at 169, 75 F.2d at 772; *see also Young*, 315 U.S. at 259, 62 S.Ct. at 512. This rationale is not necessarily convincing, however, because a reviewing court can expressly agree to honor a confession of

error, for policy reasons, without necessarily reaching the merits of appellant's contentions and announcing them as precedent. Indeed, the Supreme Court itself—both before and after *Young*—has reversed criminal convictions merely on a confession of error without evidencing any opinion about the merits. *See Casey v. United States*, 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1952); *Weare v. United States*, 276 U.S. 599, 48 S.Ct. 321, 72 L.Ed. 724 (1928). In *Casey*—a case remarkably similar to this one—the Court (with three justices dissenting on the basis of *Young* ) made very clear that it could reverse a conviction and vacate a lower court opinion, on confession of error, without creating new precedent:

> The controlling claim in this case is that there was an unreasonable search and seizure of evidence, the admission of which vitiated the convictions. Before determining these issues conflicting views as to the facts in this case and the inferences to be drawn from them would have to be resolved. The Solicitor General confesses error and asks that the judgment below should be reversed as to all the petitioners, leaving of course the way open for a new trial. To accept in this case his confession of error would not involve the establishment of any precedent.
>
> Accordingly we reverse the judgment as to all the petitioners.

*Casey*, 343 U.S. at 808, 72 S.Ct. at 999. Reflective of this division of authority within the Su-

defense counsel on appeal, citing *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), advises the court that counsel can find no nonfrivolous issue warranting reversal of the client's conviction. We review counsel's memorandum but make our own, independent examination of the record before affirming (or reversing) the conviction. *See Gale v. United States*, 429 A.2d 177 (D.C.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 389, 70 L.Ed.2d 207 (1981).

In either situation, under *Young/Parlton/Fletcher* or under *Anders*, there is a kind of role reversal. The prosecutor or the defense counsel, relying on his or her responsibility as an officer of the court, expresses an opinion of a kind that ordinarily would be made by a judge, whereas the appellate court, acting on its responsibility to be sure counsel has not defaulted, acts to assure that the rights of the government or the defendant, as the case may be, are duly respected, a function ordinarily performed by counsel. The policy justifying this approach is the belief that the prosecutor or defense lawyer should not completely give up the government's or the client's cause—which that lawyer should be advocating—without a judicial check on such behavior.

But this case is different. The government urges affirmance and has selected the arguments it believes are best suited to achieve that end: (1) lack of standing to seek suppression of evidence based on a warrantless entry, coupled with (2) admission of identification and physical evidence based, respectively, on *Terry* and probable cause. Far from confessing error, the government has vigorously argued for affirmance. Once the government has thereby assumed its traditional role of advocate, rather than the unusual stance of error-confessor, the adversary system should be allowed to function as such; the court no longer is needed, automatically, to act as an institutional failsafe to make sure that the government has not compromised its prosecutorial responsibility.

In this case, the government, as is typical of responsible counsel, has declined to advocate what it perceives to be losing arguments. It apparently sees no merit in trying to justify the entry based on consent or on exigent circumstances, and either believes the *Harris* argument is unpersuasive or deliberately ignores *Harris* to make sure we rule directly on the standing issue. *See* text accompanying note 22 *infra.* So we ask: do these tactical judgments by the prosecutor, resulting in a measure of forbearance, mean that this court should nonetheless second-guess the government's appellate strategy by invoking and examining, *sua sponte*, various arguments the government has decided not to make?

The *Young/Parlton/Fletcher* line of cases would require our doing so only on the assumption that the government—by invoking only a standing argument against appellant's *Bryant* contention—in effect is proffering a disguised confession of error. But the government is not doing that; it is vigorously pressing for affirmance pursuant to a coherent strategy fundamentally premised on a strong, and not unreasonable, belief that appellant lacks standing to challenge the warrantless entry. The fact that the government relies exclusively on alleged lack of standing, a procedural argument, without an accompanying merits defense of the trial court's suppression ruling in case the standing argument fails, does not transform the government's argument for affirmance into a confession of error.

It is one thing if the government altogether throws in the towel by joining in appellant's request for reversal. In that case, the court, as we have seen, is obliged to check out the capitulation by examining the record; the court has an institutional role as a failsafe against abandonment of

---

preme Court itself, the United States Court of Appeals for the District of Columbia Circuit has noted that "the rule in the state courts is not uniform"; the highest courts of some states have held that "the filing of a confession justifies a reversal without more" whereas in other states "the opinion is expressed that the record should be looked into." *Parlton*, 64 App.D.C. at 169–70, 75 F.2d at 772–73. Thus, although the District of Columbia courts take the latter approach, following *Young* and *Parlton*, that is not irresistibly the only option—as the Supreme Court's ruling in *Casey* clearly demonstrates.

the prosecutorial function. But it is quite another thing, when the government seeks affirmance based on reasonable appellate strategy, for this court to scrutinize whether the government—while undertaking its usual role—is doing so well enough. Were we obliged to do this in every case, we would be doing a job the prosecutor is supposed to do and would be coming perilously close to exercising an executive branch function. This confusion of roles would be inconsistent with the neutrality expected of the judiciary in our adversary system of justice.

If we were to take our dissenting colleague's approach and address the *Harris/Bryant* issue *sua sponte*, but then reach a conclusion (contrary to her own) that *Harris* did not justify the warrantless entry, presumably we would then be obliged to evaluate the entry by reference to arguably exigent circumstances—and, failing affirmance on that basis, by reference to possible consent. At what point, then, under the dissenter's theory should this court stop playing the role ordinarily assigned to the government?

■ For perspective, it is interesting to note that in deciding claims of ineffective assistance of counsel on appeal, we do not hold defense counsel accountable for failing to make every conceivable argument that the appellant wants to make; we evaluate performance, to a considerable extent, by deference to counsel's judgment about the relative merits of arguments and about the best tactical approach to take. *See Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). We see no reason to judge the government by any less deferential standard when it pursues affirmance of a conviction, rather than confessing error.

It is important to realize that, in declining to go *sua sponte* beyond consideration of the "standing" argument the government advances for affirmance, we are not relying for reversal "merely [on] the stipulation of the parties," *Young,* 315 U.S. at 259, 62 S.Ct. at 512, or "on confession of error alone," *Fletcher,* 49 A.2d at 88. Rather, we are reviewing an adversarial clash of arguments for and against reversal of appellant's conviction and refusing to venture beyond the arguments presented. The confession of error cases do not suggest that the court must *sua sponte* explore the merits of a trial court ruling in the government's favor whenever the government—although battling against reversal—loses on procedural grounds and has failed to proffer a merits argument for affirmance. It may be true that the reviewing court, for sound reason, should choose *sua sponte* to examine the merits of the trial court's ruling in a particular case under such circumstances, but that is different from a requirement to do so in every instance.

In sum, the issue in this case is not whether we are obliged to decide the appeal after an independent review of the record under the *Young/Parlton/Fletcher* line of cases, for the government has not confessed error. The issue is whether we should decide *sua sponte,* as a matter of soundly exercised discretion, to address particular arguments for affirmance the government has eschewed. We turn to that inquiry.

### C.

■ It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.[18] That principle applies to the government no less than to the defendant in a criminal case. "Parties, prosecutors included, should select the arguments they do and don't make with great care." *United States v. Leichtnam,* 948 F.2d 370, 375 (7th Cir.1991) (cit-

---

18. *See Ramos v. United States,* 569 A.2d 158, 162 n. 5 (D.C.1990); *Underdown v. District of Columbia,* 217 A.2d 659, 662 (D.C.1966); *Cratty v. United States,* 82 U.S.App.D.C. 236, 243, 163 F.2d 844, 851 (1947); 16 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3974, at 421 n. 1 (1977).

ing *Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir.1990) ("Procedural rules apply to the government as well as to defendants.")). Courts generally decline to consider arguments thus waived—even where the waived point might arguably have led to affirmance of a conviction.[19] "[W]here counsel has made no attempt to address the issue, we will not remedy the defect, especially where ... 'important questions of far-reaching significance' are involved." *Carducci v. Regan*, 230 U.S.App.D.C. 80, 86, 714 F.2d 171, 177 (1983) (citation omit-

ted).[20] This principle should be observed especially where, as here, the government appears to have deliberately conceded an issue as a matter of appellate strategy, rather than merely failing to argue the point inadvertently.

 Such self-restraint on our part is a corollary of our adversarial system, in which "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the par-

---

**19.** In *Leichtnam*, for instance, the court reversed a conviction on the ground that the government had improperly broadened the underlying indictment, notwithstanding the absence of any objection by defense counsel at trial, because the government did not assert on appeal that the defendant had failed to preserve the issue. The conviction might have been easily affirmed on plain error review, the court observed, but because the government did not make this argument on appeal, it had "waived waiver as a defense," leaving the court "to confront Leichtnam's argument on the merits and without the screen of the plain error standard." 948 F.2d at 375. In *United States v. Harris*, 942 F.2d 1125 (7th Cir.1991), the government had won convictions of two women for income tax evasion based on their failure to declare as income money that they had received from a wealthy widower "partial to the company of young women." *Id.* at 1127. The *Harris* court reversed the conviction of one of the defendants on the ground that current caselaw appeared to favor the defendants' position that this money was a gift, rather than income. The court noted that the government had presented other evidence at trial that this defendant had willfully failed to file a tax return. Because the government did not argue this point on appeal, however, the court declined to consider it as an alternative basis for affirming the conviction. *See id.* at 1134–35. In *United States v. McNeil*, 286 U.S.App.D.C. 26, 911 F.2d 768 (1990), the court reversed the convictions of several defendants because of the government's failure to comply with the provisions of the Speedy Trial Act. The court noted it was not clear that the defendants had properly invoked their speedy trial rights in the trial court, but because the government failed to raise this issue in its brief on appeal and conceded it at oral argument, the court deemed it as waived. *See id.* at 30, 911 F.2d at 772. Also, in *Griffin v. United States*, 618 A.2d 114 (D.C.1992), where this court reversed a conviction for failure to comply with the "knock and announce" requirements of D.C.Code § 33–565(g) (1988 Repl.), we declined to explore the issue of standing, *sua sponte*, where the government did not raise it on appeal. *See id.* at 119 n. 11. *See generally United States v. Turner*, 898 F.2d 705, 711 (9th Cir.)

(government waived challenge to sentence that was miscomputed in defendant's favor), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2574, 109 L.Ed.2d 756 (1990); *United States v. Woods*, 888 F.2d 653, 654 (10th Cir.1989) (government waived issue of whether defendant seeking credit on prison sentence had exhausted administrative remedies), *cert. denied*, 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990); *United States v. Moya–Gomez*, 860 F.2d 706, 746 n. 33 (7th Cir. 1988) (government waived claim that appellant, by failing to move for judgment of acquittal at trial, had lost opportunity to challenge sufficiency of evidence), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *cf. Streater v. United States*, 478 A.2d 1055, 1057 n. 3 (D.C. 1984) (government waived point it failed to raise in opposition to appellant's motion to reopen direct appeal of conviction).

**20.** Recently, over a strong dissent—and each for a different reason—two members of a panel of the United States Court of Appeals for the District of Columbia Circuit decided to affirm a conviction, despite trial court error, when the government declined to argue harmless error. *See United States v. Pryce*, 291 U.S.App.D.C. 84, 938 F.2d 1343 (1991), *cert. denied*, —— U.S. ——, ——, 112 S.Ct. 1488, 1679, 117 L.Ed.2d 629, 118 L.Ed.2d 396 (1992); *id.*, 291 U.S.App.D.C. at 93, 938 F.2d at 1352 (Silberman, J., dissenting). One member of the majority did so *sua sponte* because the relevant portions of the record were "reasonably short and straightforward" and satisfaction of the harmless beyond a reasonable doubt standard was "beyond serious debate." *Id.* at 89, 938 F.2d at 1348 (per Williams, J.). The other member of the *Pryce* majority reached the issue *sua sponte* because he believed a federal statute and a corresponding federal rule required him to do so. *See id.* at 92, 938 F.2d at 1351 (Randolph, J., concurring) (citing 28 U.S.C. § 2111 and Fed.R.Crim.P. 52(a)). *See also United States v. Giovannetti*, 928 F.2d 225, 226–27 (7th Cir.1991) (appellate court has discretion to overlook failure to argue harmlessness of error, depending on complexity of record, certainty of harmlessness, and effects of reversal).

ties before them." *Id., quoted in Ford v. United States,* 533 A.2d 617, 624 (D.C. 1987) (en banc). This is not to say an appellate court is absolutely precluded from reaching an issue *sua sponte;* it is not. *See Carducci,* 230 U.S.App.D.C. at 86, 714 F.2d at 177. But even when the courts have elected to do so, as in a *sua sponte* analysis of harmless error, *see supra* note 20, they have done so only when a statute required it [21] or when the record was not complex and resolution of the issue was easy, "beyond serious debate." *United States v. Pryce,* 291 U.S.App.D.C. 84, 89, 938 F.2d 1343, 1348 (1991) (per Williams, J.), *cert. denied,* — U.S. —, ——, 112 S.Ct. 1488, 1679, 117 L.Ed.2d 629, 118 L.Ed.2d 396 (1992), *supra* note 20. In this case, in contrast, resolution of the *Harris/Bryant* issue is not compelled by statute and, in any event, would be very difficult; the question is a close one, as the government's concession itself indicates. We do not agree with Judge WAGNER that "applicable law *clearly* supports" the trial court's ruling. *Post* at —— (emphasis added).

▇▇ Under these circumstances, we conclude that a *sua sponte* inquiry into the *Harris/Bryant* issue would be inappropriate for five reasons. First, appellant made his *Bryant* argument on appeal, and the government, through its concession, has effectively agreed with him. Thus, appellant has had no opportunity to reply to a *Harris* argument presented in its most favorable light. We therefore could not reach the issue, in fairness to appellant if not to the government, without calling for supplementary briefing. That would further prolong the period of appellate uncertainty, to appellant's detriment, and would force the government to argue an issue it has elected not to address.

Second, the government, like appellant, has had its day in court. If we were to decide to review not only the issue the government has contested (standing) but also the one it has effectively conceded (*Harris/Bryant*), we might be reaching out unnecessarily—at an undesirable cost in time and resources to all parties—to answer two difficult questions when a ruling on one would do. If, for example, the government had contested the *Harris/Bryant* issue and had a winning argument (as the dissent says it does), we might well have reached that issue and ruled for the government by assuming, solely for the sake of argument—and not deciding as we do here—that appellant had standing.[22]

Third, as already noted, the *Harris/Bryant* issue as applied to the facts here is complex; this is not a matter we could easily resolve because the answer is "beyond serious debate." *Pryce, supra* note 20, 291 U.S.App.D.C. at 89, 938 F.2d at 1348 (per Williams, J.).

Fourth, in declining to reach the *Harris/Bryant* issue we are not setting any precedent on that issue, which is one of the concerns cited for the courts' unwillingness to reverse solely on a confession of error. *See Young,* 315 U.S. at 259, 62 S.Ct. at 512; *Parlton,* 64 App.D.C. at 169, 75 F.2d at 772.

Finally, although the public is entitled to have valid judgments of conviction sustained, the public ordinarily must be bound by the actions of its counsel, just as a criminal defendant normally is. That is how the adversary system works. It is true that criminal defendants, as a matter of constitutional right, sometimes can prevail on collateral attacks on their convictions based on ineffective assistance of counsel, whereas there is no constitutional

---

21. *See Pryce,* 291 U.S.App.D.C. at 92, 938 F.2d at 1351 (Randolph, J., concurring), *supra* note 20.

22. Standing, of course, concerns only the defendant's right to assert his or her claims on the merits, not our jurisdiction to hear those claims. Consequently, in contrast with a jurisdictional question, we are not necessarily obliged to resolve a question of standing before reaching the merits if we can demonstrate that the defendant would lose on the merits even if she or he had standing. *See, e.g., Edwards v. United States,* 619 A.2d 33, 35 (D.C.1993) (assuming, without deciding, that appellant had standing to claim that his rights were violated by warrantless entry, trial court did not err in denying suppression of evidence because entry justified by exigent circumstances).

counterpart justifying affirmance of a conviction based on ineffective appellate advocacy by the government. But most of the time, criminal defendants do not prevail on ineffectiveness claims, because appellate courts give broad leeway to tactical decisions of counsel which bind their clients.[23] Similarly, the public should be bound by the prosecutor's tactical decision on appeal here, especially because this court confronts a deliberate decision by the government, not an inadvertent failure, to argue *Harris/Bryant.*

To repeat: there may be occasions when an appellate court should bail out the government by raising *sua sponte* an argument on appeal that the government has failed to raise. But this is not such a case.

*Reversed and remanded.*

WAGNER, *Associate Judge,* dissenting:

The majority's determination that it should not decide this case on the merits raises an important question: whether the government's litigating position relieves this court of its obligation to conduct a *de novo* review of a motion to suppress evidence, as we have heretofore, applying relevant case precedents. The majority answers this question in the affirmative, albeit under a discretionary standard. The position the court takes is contrary to well established legal principles. The result is that the court not only overturns what, in my opinion, is a correct judgment, it also departs from longstanding principles which have guided our independent review of questions of law in appeals from the denial of motions to suppress.

Apparently agreeing with the propositions that the courts of this jurisdiction will not set aside a conviction on a confession of error alone and that the "public interest prevents shifting the responsibility for reversal from the appellate court to the prosecuting official,"[1] the majority nevertheless declines to do so here based primarily upon two flawed premises. The first is its view that these tenets apply only to confessions of error, but not to "concessions" of error, as the majority characterizes the government's position.[2] No such distinction can be discerned in the authorities.[3]

**23.** In evaluating a claim of ineffective assistance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

**1.** *Fletcher v. United States,* 49 A.2d 88 (D.C.1946) (citing *Young v. United States,* 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942)). *See ante* at 533. The majority points out correctly that in such cases, "this court will decide the appeal based on our independent review of the merits after 'a thorough examination of the record.'" *See Parlton v. United States,* 64 App.D.C. 169, 75 F.2d 772 (1935). The majority apparently agrees with this principle, noting that "if the government altogether throws in the towel by joining in appellant's request for reversal[,] ... the court has an institutional role as a failsafe against abandonment of the prosecutorial function." *See ante* at 534. However, the majority seems to restrict this precept to only those cases in which the government as appellee capitulates on all issues raised by appellant, rather than on just some. I perceive no reasoned basis for such a narrow construction of our obligation to review an appellant's claim that the presumptively correct judgment of the trial court is in error.

**2.** In Parts I and II of the majority opinion, the Court takes the position that "[g]iven the government's 'concession' that the evidence must be suppressed if appellant has standing to make the motion, ..., we must reverse the judgments of conviction and remand for a new trial, if the government so desires, without the tangible and identification evidence attributable to the warrantless entry." *Ante* at 532; *see also ante* at 528, 530 n. 8. This, the majority contends, is not a confession of error, which precedents in this jurisdiction hold warrant independent judicial review. In Part III of the opinion, the court attempts, unsuccessfully in my opinion, to distinguish the two. *Ante* at 533–535.

**3.** Moreover, the word "concession" is by definition a synonym for "confession." *See* BLACK'S LAW DICTIONARY 296 (6th ed. 1990) (to confess is defined, *inter alia,* as "[t]o admit as true; to assent to; to concede"). The fact that the government concedes or confesses error on less than all issues is not a basis for declining to review independently appellant's claim that the trial court erred in its ruling. *See Young, supra* note 1.

The second is that this court should ignore a binding case precedent in assessing the validity of appellant's claim of error because appellee (the government) does not rely upon it, and the public should be bound by its "tactical decision" in that regard.[4] In Part I of this opinion, I explain the fallacies in these arguments and focus on the basic principles which should guide this court to consider the implications of a pertinent Supreme Court case on our disposition of the case in spite of the government's decision not to rely on it. In Part II, I explain why the judgment of the trial court should be affirmed.

## I.

The answer to the fundamental and preliminary question raised by the majority's disposition and posited at the beginning of this opinion is well settled. In *Young*, the Supreme Court resolved how the court should treat the government's confession of error in this way:

> The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. But such a confession does not relieve this Court of the performance of the judicial function. The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed. *See Parlton v. United States,* 75 F.2d 772. The public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding. That interest is entrusted to our consideration and protection as well as to that of the enforcing officers. Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties.

*Young, supra* note 1, 315 U.S. at 258–59, 62 S.Ct. at 511–12; *accord, Rinaldi v. United States,* 434 U.S. 22, 23, 98 S.Ct. 81, 82, 54 L.Ed.2d 207 (1977); *United States v. Kepner,* 843 F.2d 755, 763 and n. 6 (3rd Cir.1988); *Cachoian v. United States,* 452 F.2d 548, 550 (5th Cir.1971); *Georges v. United States,* 262 F.2d 426, 427 (5th Cir. 1959); *United States ex rel. Marino v. Holton,* 227 F.2d 886, 894 (7th Cir.1955), *cert. denied,* 350 U.S. 1006, 76 S.Ct. 650, 100 L.Ed. 868 (1956).

The decision in *Rinaldi, supra,* reflects the Supreme Court's continued adherence to the principle that the court has responsibility for making an independent determination of the law in spite of the government's concession on a particular issue. In *Rinaldi,* a defendant, who was convicted of violating the laws of both the State of Florida and the United States, claimed that his federal conviction was obtained in violation of established federal policy. The Solicitor General agreed and urged the court to vacate the judgment of the court of appeals and remand to the district court for dismissal of the indictment. 434 U.S. at 23, 98 S.Ct. at 82. Nevertheless, the Supreme Court deemed it necessary to conduct an independent evaluation of the circumstances as disclosed by the record before resolving the question.[5] *Id.*

---

**4.** The majority lists five reasons for not reaching the merits issue raised by appellant's claim of error, including the two principal ones mentioned above and others which may be viewed as related to, or arising as a result of, these two. Therefore, I address them together rather than respond to them *seriatim.*

**5.** The majority observes that the Supreme Court has reversed criminal convictions solely upon the government's confession of error before and since its decision in *Young* where it enunciated the rule that "our judicial obligations compel us to examine independently the errors confessed." *Young, supra* note 1, 315 U.S. at 258–59, 62 S.Ct.

at 511–12; *see ante* at 545, n. 17. They cite two per curiam opinions, *Casey v. United States,* 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1952) and *Weare v. United States,* 276 U.S. 599, 48 S.Ct. 321, 72 L.Ed. 724 (1928). It cannot be ascertained from the brief report of the *Weare* case, which antedated *Young,* whether the decision rested solely upon a confession of error without the court satisfying itself that reversal was warranted. In *Casey,* the Supreme Court accepted the government's confession of error, indicating that to do so would not involve the establishment of precedent and that the controlling claim required resolution of conflicting views of the facts and inferences to be drawn from them. 343 U.S. at 808, 72 S.Ct. at 999. The three

The courts of this jurisdiction have also refused to set aside a criminal conviction on the basis of a confession of error based on the principle that "public policy prevents shifting responsibility for reversal from the appellate court to the prosecuting official." *Turner v. District of Columbia,* 98 A.2d 786, 787 (D.C.1953); *accord, Dowell v. United States,* 87 A.2d 630, 631 (D.C.1952); *Hainsworth v. District of Columbia,* 72 A.2d 776, 777 (D.C.1950). In *Parlton, supra,* cited by the Supreme Court in the passage from *Young* quoted above, where the Attorney General filed a confession of error to two of appellant's assignments of error on appeal, the court nevertheless considered the alleged errors, stating that it could not on the strength of that official action alone, "acquit [itself] of [its] responsibility to examine the whole record before setting aside a conviction for crime." 64 App.D.C. at 170, 75 F.2d at 773. These cases support the principle that the court's resolution of claimed errors must rest on independent determinations that the law mandates a particular result. This court should not overturn the presumptively correct judgment of the trial court unless it is demonstrated that the judgment is erroneous. *Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982) (trial court's judgment is presumed valid, and appellant has burden of demonstrating error). If we allow the government's confession of error to become the pivotal factor, then we abdicate our responsibility to administer justice according to law. It is primarily the difference in our views about these principles which separate me from the majority in this case and prompts this dissent.

Other cases are particularly pertinent to the applicability of the *Young* principle in cases involving a *de novo* review of the legal issues. This court has adhered consistently to the proposition that in reviewing claims that the trial court erred in denying a suppression motion, we must make an independent determination of questions of law. *See Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991); *Giles v. United States,* 400 A.2d 1051, 1054 (D.C.1979); *Brooks v. United States,* 367 A.2d 1297, 1304 (D.C.1976). Our review of the trial court's legal conclusions in granting or denying a motion to suppress evidence is *de novo. Gomez v. United States,* 597 A.2d 884, 889 (D.C.1991); *Brown,* 590 A.2d at 1020; *Cauthen v. United States,* 592 A.2d 1021, 1022 (D.C.1991). On appeal from denial of a motion to suppress, "[e]ssentially, our role is to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Brown,* 590 A.2d at 1020. These standards do not allow us to ignore applicable precedents which determine the validity of the trial court's ruling even if overlooked by the parties. Thus, it is well settled that this court may affirm the trial court's ruling on a suppression motion for reasons other than those given by the trial court. *Alston v. United States,* 518 A.2d 439, 440 n. 2 (D.C.1986); *Purce v. United States,* 482 A.2d 772, 775 (D.C.1984). Even absent the trial court's findings of fact and an expression of reasons for denying a motion to suppress, we have recognized our responsibility to be "[t]o determine whether the court's denial of the motion to suppress is sustainable under any reasonable view of the evidence." *In re B.K.C.,* 413 A.2d 894, 901 (D.C.1980). In the face of these principles, it would be an abdication of our responsibility to reverse a correct ruling of

---

dissenting justices were of the view that the facts were not in dispute and that the question involved only the reach of the Supreme Court's decision in a particular case. *Id.* at 811, 72 S.Ct. at 1001. Thus, the dissent urged following the *Young* rule in its review of the case. *Id.* at 809–810, 72 S.Ct. at 999–1000. In my opinion, the decision in *Casey* cannot be read as a rejection of the *Young* rule. Moreover, the courts of this jurisdiction follow the *Young* rule, as the majority concedes today, and as I discuss later in the opinion.

The majority also suggests that we set no new precedent by avoiding the *Harris/Bryant* analysis. In my view, our published decision in this case not only sets new precedent, it alters prior ones. Particularly, today's decision establishes new parameters restricting our *de novo* review of trial court orders denying motions to suppress. Only the en banc court should overrule prior authorities of this court. *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 752 n. 2 (D.C.1983) (en banc).

the trial court on a *de novo* review where the applicable law clearly supports it.

The cases upon which the majority relies to support its position that basic principles of appellate jurisprudence weigh against a complete review, are analytically distinguishable and inapposite to our *de novo* review.[6] The cases cited involve primarily unequivocally waived issues by the appealing party, rather than, as here, an omitted exposition by appellee on a particular authority relevant to the issue actually presented.[7] Moreover, none of the cases suggest that appellate courts should ignore the implications of a principle of law or binding case precedent on the final result in reaching a decision. On the contrary, in *United States v. Pryce*, 291 U.S.App.D.C. 84, 938 F.2d 1343 (1991), *cert denied*, —— U.S. ——, ——, 112 S.Ct. 1488, 1679, 117 L.Ed.2d 629, 118 L.Ed.2d 396 (1992), cited

by the majority in support of its position that the *Bryant/Harris*[8] analysis should not be undertaken as a matter of discretion, both the concurring and dissenting opinions express the view that the court would not ignore a controlling legal precedent simply because a party failed to invoke it. *Pryce*, 291 U.S.App.D.C. at 92–93, 938 F.2d at 1351–52.[9] The majority also overlooks an important caveat to its premise which is identified in one of the other cases upon which it principally relies. In *Carducci v. Regan*, 230 U.S.App.D.C. 80, 86, 714 F.2d 171, 177 (1983), in reviewing a dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), the appellate court declined to consider a due process claim of first impression of major importance to all federal competitive service employees, where appellant did no more than assert a due process violation without discussion and failed to

---

**6.** For example, in *Ramos v. United States*, 569 A.2d 158 (D.C.1990), it was the appellant who did not raise or even suggest until oral argument that his Fifth Amendment right not to testify at a post-trial hearing on behalf of his former co-defendant had been violated. *Id.* at 162 n. 5. Although the court observed that the edict of D.C.App.R. 28(a)(3), (4) and (5) requiring a statement of issues was mandatory, it actually addressed the issue, concluding that there was nothing in the record to suggest that the appellant's Fifth Amendment rights were violated. *Id.* Similarly, in *Underdown v. District of Columbia*, 217 A.2d 659 (D.C.1966), observing that appellants had raised other points in their assignment of errors, the court considered them waived, but went on to conclude that the errors alleged were non-prejudicial. *Id.* at 662.

**7.** *See United States v. Leichtnam*, 948 F.2d 370, 375 (7th Cir.1991) (court expressed view that government's best argument against claims of instructional error and constructive amendment to indictment was waived, which government neither briefed nor argued; therefore, court left with merits review without plain error screen); *Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir. 1990) (under Circuit Rule 28(f), argument for reversal not appearing until reply brief not considered); *Griffin v. United States*, 618 A.2d 114, 119 n. 11 (D.C.1992) (standing issue not addressed by trial court nor raised on appeal not considered); *United States v. Harris*, 942 F.2d 1125, 1134–35 (7th Cir.1991) (criminal conduct not referred to in indictment or jury instructions is waived as a basis for conviction); *United States v. McNeil*, 286 U.S.App.D.C. 26, 30, 911 F.2d 768, 772 (1990) (where not clear to court that defendants properly invoked speedy trial

claim, but government believed they did, court considered claim on merits); *United States v. Turner*, 898 F.2d 705, 711 (9th Cir.) (government's failure to contest in accordance with statute, a sentence below the guideline range, waives any challenge to it), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2574, 109 L.Ed.2d 756 (1990); *United States v. Woods*, 888 F.2d 653, 654 (10th Cir.1989) (failure to exhaust administrative remedies does not preclude judicial review where no objection raised), *cert. denied* 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990); *Streater v. United States*, 478 A.2d 1055, 1057 n. 3 (D.C. 1984) (failure to raise *res judicata* bar in opposition to motion to reopen direct appeal is too late for consideration after motion granted and appeal being considered on the merits).

**8.** *Bryant v. United States*, 599 A.2d 1107 (D.C. 1991); *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990).

**9.** In *Pryce*, the three judge panel, each of whom wrote a separate opinion, addressed whether the court should undertake a harmless error analysis where the government failed to raise the issue. 291 U.S.App.D.C. at 89, 938 F.2d at 1348. Unlike the question involved here, it is the government's burden to demonstrate that trial court error is harmless. *See Arizona v. Fulminante*, 499 U.S. 279, ——, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991). Therefore, it is understandable that Judge Williams, writing for the court, expressed concern that the court would be shouldering a burden for which one of the parties was responsible if it undertook the harmless error analysis on its own initiative. *Pryce*, 291 U.S.App.D.C. at 88, 938 F.2d at 1347.

brief, argue or explain the claim. Significantly, the court gave the following caveat to its holding which is applicable here:

> Of course not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel *through our own deliberation and research.*

*Id.* (emphasis added).[10] In this case, we are not called upon to identify or raise *"sua sponte"* the issue. Appellant has raised the issue, and we need only apply the pertinent legal principles to the case. In my opinion, we can neither fully address appellant's claim of error nor discharge our obligation to review *de novo* the question of law pertinent to the disposition of the case without considering the effect of the Supreme Court's decision in *New York v. Harris, supra* note 8, on the outcome. For these reasons, and for others appearing later in this opinion, it is my view that we should decide the merits of appellant's claim of error in the trial court's decision denying the motion to suppress.

## II.

In my opinion, the trial court did not err in denying appellant's motion to suppress evidence and identification, and reversal of appellant's two convictions for drug offenses on that ground is not warranted. The majority's decision rests upon two faulty premises as I see it. The first is that appellant established a legitimate expectation of privacy in the apartment where the police arrested him. On this issue, I disagree with the majority's application of the law to the facts, and thus, reach a different result. The second, as I have already discussed, is that this court should not apply relevant case precedents in its *de novo* review of the trial court's

legal conclusion that no constitutional violation occurred because appellee conceded or waived the legal argument on appeal. A *de novo* review will reveal that the exclusionary rule does not preclude the admission of the appellant's identification and the evidence seized from him under the principles extracted from *Harris, supra.* Therefore, I would affirm.

To establish standing in a case such as this, a defendant has the burden of showing that he has a legitimate expectation of privacy in the area where the police found him. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Moore v. United States,* 468 A.2d 1342, 1345 (D.C.1983); *United States v. Booth,* 455 A.2d 1351, 1353 (D.C.1983). Unless a defendant meets that burden, he cannot challenge the government's intrusion into the claimed area of privacy under the Fourth Amendment. *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). An expectation of privacy may be subjective, and it is legitimate " 'if it is one that society is prepared to recognize as reasonable.' " *Lewis v. United States,* 594 A.2d 542, 544 (D.C.1991) (quoting *Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 1687–88, 109 L.Ed.2d 85 (1990)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992). Factors pertinent to that determination include:

> "whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has the right to exclude others from the place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises."

---

**10.** Also relying on *Ford v. United States,* 533 A.2d 617, 624 (D.C.1987) (en banc), for its position, the majority quotes the language from *Carducci,* but in *Carducci,* that language is followed by the caveat quoted above which recognizes that an appellate court is not precluded from applying the law or addressing an issue even if not identified by the parties. In any event, the language in *Ford* is dicta. In *Ford,* the court simply declined to be bound in deciding an

issue by a prior case in which the issue was not raised or decided. 533 A.2d at 624–25. In *Griffin, supra* note 7, the trial court had not reached the issue involved, and the government had not raised it at all. 618 A.2d at 119 n. 11. Here, the trial court, as recognized by both parties, extensively addressed whether the entry into the apartment was lawful before concluding that, whether it was or not, no evidence had been seized as a result.

*United States v. Robinson*, 225 U.S.App. D.C. 282, 288, 698 F.2d 448, 454 (1983) (quoting *United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir.1981)); *see also Booth*, 455 A.2d at 1353. Further, it is not sufficient that one is simply "legitimately on the premises." *Olson*, 495 U.S. at 97, 110 S.Ct. at 1688. Considering the facts of this case in light of established criteria for the analysis, in my opinion, appellant failed to make the requisite showing.

According to appellant's testimony, he was passing his aunt's apartment with friends when she called to him from the window to ask if he had any cigarettes. Appellant said he went inside the apartment to give her the cigarettes and planned to "come right back out" because his two friends were waiting. Appellant testified that he visited his aunt and uncle once or twice a week to check on them, but that he did not "make it a habit." According to appellant, he was there only a minute or thirty seconds before the police knocked. Appellant's uncle, Samuel Rose, testified that he had not expected appellant to visit that day. There was testimony that while appellant and the undercover officer were conversing in the hallway, a woman opened the door to the apartment and asked appellant if he wanted her to leave the door open. Appellant responded, "No, I'm coming in." Appellant extended the undercover officer an invitation to return to the area or to the apartment for more drugs. He also remarked that he did not know why the person inside asked if he wanted the door left open, since he had a key.[11] Appellant offered no evidence that he was ever an overnight guest, a former tenant, kept clothing in the apartment, contributed financially to the payment of rent, or that he had access or control over the premises except as described here.

Based upon the showing that appellant was visiting a relative's apartment only momentarily, which he did from time to time, and appellant's remark to the undercover officer that he had a key, the majority concludes that appellant has demonstrated a sufficient expectation of privacy to challenge the police entry into the apartment. This is a slender thread to which to tie a claim that appellant had a cognizable protected interest in the premises. Guest status, particularly for a visit of a few minutes duration, is insufficient to demonstrate the type of connection with the premises which would establish a reasonable expectation of privacy under applicable precedents. *See Prophet v. United States*, 602 A.2d 1087, 1091 (D.C.1992).

In reaching the conclusion that appellant established standing in the trial court, the majority relies heavily upon appellant's statement to the undercover officer at the time of the drug sale that he possessed a key to the apartment where the police located him. From this evidence, the majority draws inferences which are not the only reasonable ones and which were not made by the trier of fact. The circumstances under which appellant obtained any key and the extent to which he was authorized by the lawful occupant of the premises to use it were not in evidence. Furthermore, the statement of the woman apparently in charge of the premises was contrary to appellant's assertion that he had a key. Nevertheless, the majority infers "that appellant had his aunt's and uncle's permission to enter the apartment as he wished, day or night, that he could therefore expect to use it as a place of refuge, and that appellant was in a position to admit or exclude someone from the apartment." It is not our appellate function to engage in such factfinding by selecting which of the possible inferences to draw. It is the province of the factfinder to draw reasonable inferences from the evidence. *Shelton v. United States*, 505 A.2d 767, 769 (D.C. 1986); *Mallory v. United States*, 178 A.2d 918, 920 (D.C.1962); *Capital Transit Co. v. Bingman*, 94 U.S.App.D.C. 75, 76–77, 212 F.2d 241, 242–43 (1954); *Trout v. Lehman*, 702 F.2d 1094, 1100 (1983), *vacated on other grounds*, 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984). When appellant's

---

11. Appellant's uncle testified at trial that he let appellant into the apartment that day after appellant knocked.

naked assertion that he had a key is examined in the context of the record as it actually exists, without elaboration, and considering the lack of other factors pertinent to the standing inquiry as described in *Robinson, supra,* any claim that appellant had standing is dispelled.[12]

Moreover, appellant took no precautions to maintain any privacy here, which further detracts from his claim. *See Robinson, supra,* 225 U.S.App.D.C. at 288, 698 F.2d at 454. Not only did appellant answer the knock at the door, according to the trial court's factual findings, but he had invited the undercover officer to return to make another purchase. Whatever expectation of privacy existed to exclude the police or other unwanted visitors from entering the premises, that interest could not extend to secreting appellant from the view of one who knocked at the door, if appellant chose to open it. The Fourth Amendment does not preclude the police from simply knocking at the door of an abode. One who opens the door without compelling those on the other side to identify themselves or without taking other precautions to prevent being seen can have no reasonable expectation that the caller will not see him. *See Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); *see also United States v. Colyer,* 878 F.2d 469, 477 (D.C.Cir.1989). Here, once appellant opened the door, the police could readily observe and identify

him as the person described in the lookout broadcast. Thus, they had "more than enough," in the trial court's words, to detain or arrest appellant at that point. The officers' subsequent entry across the threshold of the apartment to seize appellant "contributed nothing to the evidentiary basis for arresting him." *See Bryant, supra* note 8, 599 A.2d at 1111 (citing *New York v. Harris, supra* note 8).

In my view, even assuming appellant had standing, the outcome of this case is controlled by the principles established by the Supreme Court in *Harris.* In *Harris,* the Court held that where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the state's use of a statement made by the defendant at the police station, despite the fact that he was arrested earlier at his home in violation of *Payton.*[13] Accepting the trial court's ruling that the police had probable cause to arrest Harris *before* they physically entered his home without a warrant or consent, the Supreme Court concluded that Harris' statement made at the station later was not the product of the unlawful intrusion into Harris' home; and, therefore, it was admissible. *Harris, supra,* 495 U.S. at 20, 110 S.Ct. at 1644.[14] The Supreme Court reasoned that suppressing the statement taken outside the house

> would not serve the purpose of the [exclusionary] rule that made Harris' in-house arrest illegal. The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it

**12.** *See also Everroad v. State,* 570 N.E.2d 38, 45–46 (Ind.App.1991) (appellants had no standing to challenge seizure of contraband from their mother's house where one only occasionally spent the night and the other was in the process of moving out and stayed there only "off and on.")

**13.** *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 1374–75, 63 L.Ed.2d 639 (1980) ("The Fourth Amendment ... prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest.")

**14.** The majority appears to be under the impression that if it were to reach the *Harris* issue, it would have to evaluate the lawfulness of the entry, which this court is required to do in reviewing a suppression motion based on an alleged Fourth Amendment violation. *See ante* at 534–535. However, under *Harris,* as previously noted and as discussed *infra,* whether the entry was lawful is irrelevant if nothing was seized as a result of the alleged violation of the suspect's Fourth Amendment rights. Even assuming standing and an unlawful entry, *Harris* is clear that if nothing was seized, there is nothing for the trial court to suppress.

should have been; the purpose of the rule has thereby been vindicated.... If we did suppress statements like Harris', moreover, the incremental deterrent value would be minimal. Given that the police have probable cause to arrest a suspect in Harris' position, they need not violate *Payton* in order to interrogate the suspect. It is doubtful therefore that the desire to secure a statement from a criminal suspect would motivate the police to violate *Payton*. As a result, suppressing a stationhouse statement obtained after a *Payton* violation will have little effect on the officers' actions, one way or another.

*Id.* at 20–21, 110 S.Ct. at 1644. The Court also noted that "anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been[.]" *Id.* at 20, 110 S.Ct. at 1644.[15]

In this case, the police seized nothing after entering the apartment, neither the identification nor the drugs. The trial court found that the police had probable cause to arrest appellant before they intruded into the apartment. In that regard, the court stated:

So it seems to me that there is really no serious question in my mind. I know of no real authority that says under those circumstances the officers standing on the threshold, looking across the threshold, seeing the defendant, could not place him—take him into custody. Either probable cause to arrest, which I think they had then, or reasonable suspicion. I think there is more than reasonable suspicion. They could have taken him even under those circumstances.

Moreover, I seriously question the defendant having any standing about being hauled out of his aunt's home under those circumstances. Nothing was searched. The entry was not in any

way—The move was not part of the officers to search the premises [sic]. No suggestion that the officers looked around. Went in, got the body, and took the body out.... I frankly do not know if any search took place once the officers crossed the threshold.... [B]ut whether frisk or search is immaterial because there was nothing seized there. So there is nothing to suppress, even if an illegal search was held.

In my view, the government is correct that *Bryant*, which was decided after the hearing on appellant's suppression motion, is distinguishable. In *Bryant*, we concluded that the case did not fall within the rule in *Harris* because in *Harris* "the discovery of the defendant inside his home contributed nothing to the evidentiary basis for detaining him." 599 A.2d at 1111. In *Bryant*, police had already entered the house and begun searching it *before* they saw appellant and seized him in the basement. Dispositive to our decision to reverse in *Bryant* was that the broadcast description of Bryant was "too general to justify seizing anyone under *Terry*.[16] Numerous males in various parts of the city might have matched that description." *Id.* at 1112 (citations omitted).

Unlike *Bryant*, the police here had not yet unlawfully entered the apartment before they had the predicate for appellant's arrest. Here the description of appellant was detailed enough to provide the basis for a lawful seizure.[17] In ruling that the evidence could be admitted, the trial judge stated:

I credit the testimony of [appellant] as to who answered the door, and it was the defendant who answered that door and *was standing there in the door* when the officers got there. However, I'm not sure ... that either version makes any difference, because there he is standing at the door, *he fits the description that*

---

**15.** Harris had also made an incriminating statement inside the house, but it was suppressed by the trial court, and its suppression was not challenged on appeal.

**16.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**17.** Officer Davis' description was for a "black male, medium to dark complexion, blue baseball cap with white patch and his hat turned around backwards, white short sleeve shirt over top of black sweat suit ... and blue pants."

*was broadcast.* My judgment had a combination of description as well as the physical location *more than enough* to establish probable cause.

(Emphasis added). Therefore, the unlawful entry yielded nothing, as the trial court stated, except appellant's person. As in *Harris,*

> [t]here could be no valid claim ... that Harris was immune from prosecution because his person was the fruit of an illegal arrest.... Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed.... For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his doorstep, illegally entered his home to search for evidence, and later interrogated Harris at the station house.

495 U.S. at 18, 110 S.Ct. at 1643 (citing *United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 1251–52, 63 L.Ed.2d 537 (1980)). Similarly, in this case, the showup identification and drugs were "seized" from appellant outside his aunt's apartment. The police did not have to enter to establish articulable suspicion or probable cause, and the entry contributed nothing to the justification for seizure. Therefore, appellant's identification and the evidence seized from him did not result from the illegal entry into the apartment, and the trial court did not err in denying the motion to suppress. *See Harris,* 495 U.S. at 20, 110 S.Ct. at 1644.

Finally, as discussed above, I cannot agree with the majority that the *Bryant/Harris* issue was not addressed on appeal. Appellant relied heavily on *Bryant* to support his claim that the trial court erred in denying the motion to suppress. Without citing *Harris,* the trial court also based its ruling, at least in part, on an analysis supportable under *Harris.* The trial court found that the police had probable cause for appellant's arrest before the officers crossed the threshold of the apartment and that nothing had been seized inside the apartment, as a result of which there was nothing to suppress. In *Harris,* these same issues were critical to the court's determination of the suppression motion against Harris. In order for appellant to demonstrate trial court error, he would be required to square his position based on *Bryant* with the Supreme Court's ruling in *Harris,*[18] or distinguish it, particularly in view of the trial court's factual findings. Therefore, I cannot agree with the majority that appellant was not called upon or has not had a fair opportunity to address the issue. Thus, we do not have before us a case where an issue was not raised, as the majority suggests, but rather one where a controlling authority was not pressed by the appellee in support of the issue.

The predicate factual findings have been made to address the *Harris* issue, and we have only to apply the law which, in my view, is consistent with the trial court's legal conclusion. Because it is our duty to undertake a *de novo* review of the trial court's ruling on this Fourth Amendment issue, even if the government has decided not to add its voice to the argument raised by the trial court and by appellant, we are not absolved from our responsibility to test the trial court's legal conclusion against the applicable authorities. *Young, supra,* 315 U.S. at 258–59, 62 S.Ct. at 511–12.

For the foregoing reasons, I would affirm the decision of the trial court. Therefore, I must dissent from the decision of the court.

---

18. Without elaboration, the government in its brief also stated its belief that *Bryant* is distin- guishable from *Harris.*