COLORADO COURT OF APPEALS                                    **2016COA133**

Court of Appeals No. 16CA0915
City and County of Denver Probate Court No. 92MH609
Honorable Ruben M. Hernandez, Magistrate

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of C.J.R.,

Respondent-Appellant.

ORDER AFFIRMED IN PART
AND REVERSED IN PART

Division V
Opinion by JUDGE BERGER
Román, J., concurs
Bernard, J., concurs in part and dissents in part

Announced September 8, 2016

Cristal Torres DeHerrera, Interim County Attorney, Michael J. Stafford,
Assistant County Attorney, Denver, Colorado, for Petitioner-Appellee

Culwell Law LTD, Jonathan B. Culwell, Lakewood, Colorado, for Respondent-
Appellant

¶ 1 This case requires us to decide whether the Denver Probate Court had the authority to order the involuntary administration of a drug to "chemically castrate"[1] C.J.R., a person civilly committed to a state hospital. We hold that absent legislative authority, which does not exist, the probate court has no such authority. Therefore, we reverse the portion of the probate court's order authorizing the involuntary administration of the drug Depo-Provera.[2]

## I. Facts and Procedural History

¶ 2 C.J.R. is a long-term patient at the Colorado Mental Health Institute at Fort Logan (state hospital), where he has been treated for a schizoaffective disorder, which is a form of psychosis. Manifestations of his illness include hallucinations about dead babies and the belief that his food and his medicine are

---

[1] The term "chemical castration" has been used by a number of courts and other authorities to describe the use of the drug Depo-Provera on men to control their sexual desires and behavior. *See, e.g., People v. Collins*, 1 Cal. Rptr. 3d 641, 643 (Cal. Ct. App. 2003). We recognize that the term may not be strictly accurate regarding its physical effects on men, but we use it here because it is the most commonly used term by courts and legislatures to describe the treatment.

[2] C.J.R. also challenges the portion of the probate court's order authorizing the use of a nasogastric tube to involuntarily administer medications other than Depo-Provera. We affirm that portion of the probate court's order.

contaminated. His psychiatrist believes that C.J.R. "continues to show disorganized thinking, speech and behavior."

¶ 3 C.J.R. has engaged in what his psychiatrist described as "sexually inappropriate behavior" for some time. He has often emerged naked from his room into the ward, where there are both men and women. He has masturbated in front of members of the hospital's staff. But until recently, he would normally comply when a staff member told him to put on clothing.

¶ 4 For many years C.J.R. was treated, with more or less success, with antipsychotic drugs. However, while taking one of those drugs, Clozaril, he suffered a grand mal seizure. The state hospital was concerned that the seizure might have been caused by Clozaril and thus ceased giving that drug to C.J.R.[3] The hospital continued to treat C.J.R. with other antipsychotic drugs.

¶ 5 After cessation of the administration of Clozaril, C.J.R.'s sexually inappropriate behavior worsened. He would appear without clothing even more frequently than he had before, frightening female patients on his ward. He "repeatedly and

---

[3] This proceeding does not concern the administration of antipsychotic drugs or anti-seizure medications.

inappropriately solicited staff members for sex." He grabbed one of the nurses near her breasts and groin area, and he repeatedly engaged in masturbatory conduct in view of other patients and staff. According to C.J.R.'s psychiatrist, he has become more physically aggressive, "punching, kicking [and] scratching" staff members.

¶ 6 To address these serious problems, a psychiatrist at the state hospital prescribed the administration of the drug Depo-Provera. The psychiatrist testified that there was "considerable clinical evidence" that Depo-Provera "decreases libido," and that given C.J.R.'s "hypersexual behavior," the drug could "help him manage some of his sexual urges." The Depo-Provera would be administered by injection, and one injection would last ninety days.

¶ 7 C.J.R. refused to take the drug voluntarily.

¶ 8 Depo-Provera is generally used as a contraceptive for women, but it has been used on males in an attempt to prevent the type of inappropriate sexual behavior C.J.R. has been engaging in. Peter J. Gimino III, Comment, *Mandatory Chemical Castration for Perpetrators of Sex Offenses against Children: Following California's Lead,* 25 Pepp. L. Rev. 67, 73 (1997). When administered to males,

Depo-Provera, which contains a synthetic hormone "similar to the progesterone hormones produced by the body naturally," lowers the level of testosterone, reduces the sex drive, and in most instances causes temporary impotence. *People v. Gauntlett,* 352 N.W.2d 310, 314 (Mich. Ct. App. 1984). The use of Depo-Provera for these purposes is commonly known as chemical castration. *See, e.g., People v. Collins,* 1 Cal. Rptr. 3d 641, 643 (Cal. Ct. App. 2003).

¶ 9     The Food and Drug Administration (FDA) has approved Depo-Provera for use as a contraceptive, *Colville v. Pharmacia & Upjohn Co.,* 565 F. Supp. 2d 1314, 1317 (N.D. Fla. 2008), but the FDA has not approved its use for chemical castration, Gimino, 25 Pepp. L. Rev. at 74. However, once a drug is FDA approved, a licensed physician generally may prescribe it for any purpose. *United States v. Caronia,* 703 F.3d 149, 153 (2d Cir. 2012). This is referred to as an off-label use of the drug. *Id.*

¶ 10    C.J.R.'s psychiatrist testified that Depo-Provera can "cause feminizing effects in men," which includes a decrease of muscle mass and the development of breasts. She also testified that a loss of bone mass (osteoporosis) may occur. In the psychiatrist's letter to the probate court, which was attached to the People's motion for

authority to involuntarily administer Depo-Provera to C.J.R., she further stated that "[f]acial and body hair may . . . decrease in thickness and growth," and "[r]isks may also include lowered sperm count, decreased libido, erectile dysfunction and shrinking testes size."

¶ 11    Through his court-appointed counsel, C.J.R. objected to the administration of Depo-Provera and the use of a nasogastric tube to administer other medications involuntarily.  The People sought authorization from the Denver Probate Court to administer Depo-Provera involuntarily and, if necessary, to use a nasogastric tube to administer other medications, including antipsychotics.  The probate court authorized the involuntary administration of Depo-Provera and use of a nasogastric tube.

¶ 12    C.J.R. now appeals that order.[4]

---

[4] The probate court's order authorizing the involuntary administration of Depo-Provera expires on September 25, 2016. The drug is administered by injection and lasts approximately ninety days.  We assume that the drug has already been administered as the probate court's register of actions indicates that a stay of its order was not "authorized."  The order thus may expire before another dose of Depo-Provera is administered. However, "[i]n certain cases, an appeal of a short-term mental health treatment order does not become moot when the order expires if the issue on appeal is capable of repetition but evading

## II. Standard of Review

¶ 13      The first question we address — whether the test established by the supreme court in *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985), applies at all to a request to chemically castrate a person against his will — is purely a question of law that we review de novo. *See People in Interest of A.M.*, 251 P.3d 1119, 1121 (Colo. App. 2010) (stating that whether the trial court applied the correct legal standard is a question of law that we review de novo).

¶ 14      The second question, assuming that *Medina* applies, is whether the People satisfied all four of its factors. In answering this question, we must determine whether the evidence, when viewed as a whole and in the light most favorable to the People, is sufficient to support the probate court's order. *Fifth Third Bank v. Jones*, 168 P.3d 1, 2 (Colo. App. 2007). We review de novo the probate court's conclusions of law and defer to the court's findings of fact if any evidence in the record supports them. *People in Interest of Strodtman*, 293 P.3d 123, 131 (Colo. App. 2011).

---

review." *People in Interest of Vivekanathan*, 2013 COA 143M, ¶ 9. Because it is reasonably likely that the hospital will seek authority to re-administer the drug, we conclude that the appeal is not moot. *See, e.g., People in Interest of R.K.L.*, 2016 COA 84, ¶ 12 n.2.

### III. The Probate Court Did Not Have any Legal Authority to Order the Involuntary Chemical Castration of C.J.R.

¶ 15    In *Medina,* the Colorado Supreme Court formulated a four-factor test that the People must satisfy before a court may order a patient to be forcibly medicated. While C.J.R. does not expressly argue (and did not argue in the trial court) that *Medina* has no application to the involuntary administration of Depo-Provera, he does argue that *Medina* is inapplicable because it applies only to the involuntary administration of antipsychotic drugs, and there is no evidence in this record that Depo-Provera is an antipsychotic drug.

¶ 16    But assuming that C.J.R. did not raise the issue whether the trial court erred in applying *Medina,* we "may in [our] discretion notice any error appearing of record." C.A.R. 1(d). C.J.R.'s argument that the *Medina* factors were not met, and the People's contrary argument that they were, rests on the assumption that *Medina* applies. Were we to affirm the probate court's order without addressing the underlying validity of this critical assumption, we might well be authorizing the administration of involuntary medication that the laws of this state prohibit.

¶ 17     In *Medina*, 705 P.2d at 968, the supreme court emphasized that the decision to forcibly medicate a patient with antipsychotic drugs "directly implicates the patient's legal interests in personal autonomy and bodily integrity." The supreme court noted that antipsychotic medications "can cause numerous and varied side effects and carry with them the risk of serious and possibly permanent disabilities in the patient." *Id.* The forced administration of antipsychotic medication thus constitutes a "significant intrusion on the patient's bodily integrity." *Id.* at 969.

¶ 18     Given that forcing C.J.R. to take Depo-Provera against his will is at least as significant an intrusion, the importance of determining whether such a disruption to his bodily integrity is legally authorized cannot be reasonably disputed.[5] Thus, under these

---

[5] We ordered the parties to file supplemental briefs to address whether Colorado courts have the statutory authority to order involuntary administration of Depo-Provera and whether the *Medina* test is applicable to the involuntary administration of Depo-Provera. In his supplemental brief, C.J.R. raises, for the first time, a constitutional argument that the involuntary administration of Depo-Provera is barred by his asserted constitutional right to reproductive rights. We do not address this argument both because we have resolved this case on statutory grounds and because we do not consider constitutional arguments made for the first time in a reply or supplemental brief. *Giuliani v. Jefferson Cty. Bd. of Cty.*

8

particular circumstances, we believe that we must address the validity of the parties' and the trial court's assumption that *Medina* applies. "[W]hen a trial court fails to fully apply the correct [legal] standard . . . its ruling cannot stand." *People v. J.D.*, 989 P.2d 762, 769 (Colo. 1999).

¶ 19    We therefore consider the threshold question raised by this appeal: whether *Medina* applies to a request to involuntarily administer the synthetic equivalent of progesterone as part of the treatment for a mentally ill, male patient at a state hospital for the express purpose of controlling his sexually inappropriate behavior.

¶ 20    The state's authority to involuntarily commit mentally ill persons to the state hospital for care and treatment arises by statute. *See* §§ 27-65-101 to -111, C.R.S. 2015. If a person who has been involuntary committed refuses to take medication that hospital personnel want to administer, section 27-65-111(5)(a) provides a court with authority to order that "the medication be forcibly administered to him." If the involuntary administration of a

---

*Comm'rs*, 2012 COA 190, ¶ 54; *see also People v. Czemerynski*, 786 P.2d 1100, 1107 (Colo. 1990).

drug is outside of this statutory authorization, a court exceeds its authority to order it.

¶ 21     In *Medina*, 705 P.2d at 967, the supreme court explained that "Colorado's statutory scheme relating to involuntary commitment of the mentally ill clearly contemplate[s] that such persons . . . have the right under appropriate circumstances to legitimately refuse treatment." However, the supreme court also discussed the General Assembly's implicit recognition that "the right of an involuntarily committed and incompetent mental patient to refuse treatment is [not] absolute" because "[t]he state . . . has a legitimate interest in effectively treating the illnesses of those placed in its charge and . . . protecting patients and others from dangerous and potentially destructive conduct within the institution." *Id.* at 971 (citing Ch. 188, sec. 2, § 27-10-111(4.5), 2010 Colo. Sess. Laws 690, which has been relocated to section 27-65-111(5)(a)).

¶ 22     *Medina* held that its four-part test accommodated both the statutorily recognized right of the patient to refuse treatment and the statutory right of the state to forcibly treat a nonconsenting patient under certain circumstances. *See id.* at 972. A plain reading of *Medina* demonstrates that the supreme court addressed

10

only the involuntary administration of antipsychotic drugs. By its terms, however, section 27-65-111(5)(a) is not limited to antipsychotic medications; instead, it applies more broadly to "medication[s]." But even assuming that *Medina* applies to other types of treatments, *see People in Interest of M.K.M.*, 765 P.2d 1075, 1076 (Colo. App. 1988) (applying *Medina* to a petition to administer electroconvulsive therapy), chemical castration is very different than the administration of treatments designed to treat severe mental illnesses.[6]

¶ 23     Here, the state wants to administer medication not for the purpose of treating the mental condition that causes C.J.R. to engage in sexually inappropriate behavior, but rather to specifically control certain objectionable behavior by changing the hormonal balances that define male and female sexual characteristics. *See* Society for Endocrinology, *Testosterone*, https://perma.cc/TB5Q-JTC2 (Testosterone "stimulates the development of male

---

[6] Contrary to the dissent's characterization of this opinion, we do *not* hold that *Medina* is applicable *only* to the involuntary administration of antipsychotic drugs. Rather, we address only the limited question presented here: whether *Medina* applies to the involuntary administration of a synthetic hormone for the purpose of controlling a male patient's "inappropriate sexual behavior."

11

characteristics."). While the dissent is correct that scientists do not know everything about the causes of psychosis, or even the precise effects that antipsychotic drugs have upon the brain, it remains true that the nature of the treatment in this case is far different than the administration of antipsychotic drugs. Psychiatric medications, like antipsychotics, "work by influencing the brain chemicals regulating emotions and thought patterns." National Alliance on Mental Illness, *Mental Health Medications*, https://perma.cc/E6BH-KMNG. Antipsychotics "reduce or eliminate the symptoms of psychosis . . . by impacting the brain chemical called dopamine." *Id.* Unlike chemicals produced by the brain, testosterone is a hormone produced in the testes and the adrenal glands (glands that sit on top of the kidneys). Society for Endocrinology, *Testosterone*. A drug that affects a man's testosterone production, such as Depo-Provera, therefore does not affect the brain in the same way as psychiatric medications, like antipsychotics do.

¶ 24     But regardless of what medical information we or the dissent can cite to support our respective points about the similarity or dissimilarity of antipsychotics and Depo-Provera, or what

determinations we can make regarding whether the effects of antipsychotics are just as bad or worse than the effects of Depo-Provera, the fact remains that these judgments are not ours, as judges, to make. In *Medina,* the supreme court concluded that the General Assembly had implicitly authorized the involuntary administration of antipsychotic medications if certain factors were met. While we recognize (but do not decide) that *Medina*'s holding might logically be extended beyond the involuntary administration of antipsychotics to other types of psychiatric treatments, we cannot conclude from *Medina*'s analysis that the General Assembly has implicitly authorized the forcible administration of synthetic hormones for the purpose sought here.

¶ 25 Considering as a whole the statutory scheme addressing the care and treatment of persons with mental illnesses, we do not believe that the General Assembly's authorization to forcibly administer medication to nonconsenting patients gives the state unlimited authority to administer *any* treatment whatsoever as long as its administration satisfies the *Medina* factors, and neither the supreme court nor any division of this court has held that it does. Indeed, such a conclusion would contradict the supreme court's

determination that a patient's common law right to decline medical treatment is not abrogated by involuntary civil commitment alone. *Goedecke v. State, Dep't of Insts.*, 198 Colo. 407, 411, 603 P.2d 123, 125 (1979).

¶ 26    The General Assembly has declared that the purposes of the statutory scheme are, among other things:

> (a) To secure for each person who may have a mental illness such care and treatment as will be suited to the needs of the person and to insure that such care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity;
>
> (b) To deprive a person of his or her liberty for purposes of treatment or care only when less restrictive alternatives are unavailable and only when his or her safety or the safety of others is endangered; [and]
>
> (c) To provide the fullest possible measure of privacy, dignity, and other rights to persons undergoing care and treatment for mental illness[.]

§ 27-65-101(1).  The General Assembly has directed that the provisions of the statutory scheme are to be "liberally construed" to carry out these purposes.  § 27-65-101(2).

¶ 27    This statute thus "recognize[s] that mental and emotional illnesses are not crimes and that hospitalization for their treatment is not to be confused with incarceration for punishment." *Goedecke*, 198 Colo. at 411, 603 P.2d at 125. Because the involuntary chemical castration of an individual poses such an affront to his "dignity and personal integrity," § 27-65-101(1)(a), we conclude that the involuntary chemical castration of a person under these circumstances may be authorized, if at all, only by the General Assembly (and then only if consistent with the Constitutions of the United States and the State of Colorado).

¶ 28    The General Assembly has not done so. A number of years ago the General Assembly considered, but ultimately rejected, a law that would have permitted or required chemical castration for those convicted of certain sexual assaults on a child. H.B. 1133, 61st Gen. Assemb., 1st Reg. Sess. (Colo. 1997).[7] While by no means dispositive, the fact that the General Assembly declined to authorize

---

[7] A small minority of states (eight) have authorized involuntary chemical castration of certain offenders convicted of sexual offenses against children. *See* Mark D. Kielsgard & Jack Burke, *Post-Incarceration Supervision of Pedophile Offenders: An International Comparative Study*, 51 No. 1 Crim. L. Bull. art. 1 (Winter 2015). Similarly, a number of foreign nations also authorize involuntary chemical castration for certain offenders. *See id.*

chemical castration for persons convicted of criminal offenses supports our conclusion that, without express legislative authorization, the courts of this state do not have the authority to order chemical castration as part of the mental health treatment of a civilly committed patient. "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

¶ 29 We conclude that a court, including this court, may not arrogate to itself the authority to impose such a treatment against the will of an individual who has been involuntarily committed to a mental health treatment facility.

¶ 30 The application of the *Medina* test to chemical castration, moreover, has far-reaching implications. The dissent's analysis easily could support not only chemical castration, but physical castration as well.[8] This expansive view also conjures up visions of

---

[8] The dissent asserts, in reliance upon a law review article (which relies on another law review article), that chemical castration, unlike physical castration, is reversible. *See* Peter J. Gimino III, Comment, *Mandatory Chemical Castration for Perpetrators of Sex*

16

involuntary lobotomies, a practice that has long since been discredited both on legal and moral grounds. *See* Sheldon Gelman, *Looking Backward: The Twentieth Century Revolutions in Psychiatry, Law, and Public Mental Health*, 29 Ohio N.U. L. Rev. 531, 532 (2003). Broadly applying *Medina*'s holding to authorize any type of "treatment" the facility wants to impose on the patient is irreconcilable with the legislative mandate to administer care and treatment "with full respect for the [patient's] dignity and personal integrity," § 27-65-101(1), and "would render the patient's interest in bodily integrity nothing more than an illusion," *Medina*, 705 P.2d at 974.

### IV. The People Did Not Satisfy the *Medina* Elements

¶ 31    Even if we were to assume that the *Medina* test is applicable to a state request to chemically castrate an individual against his will, we conclude that the People did not prove by clear and convincing evidence that the requirements of *Medina* were established here. *See* § 27-65-111(1) (standard of proof).

---

*Offenses against Children: Following California's Lead*, 25 Pepp. L. Rev. 67, 75 (1997). That may or not be true, but this skeletal record does not permit this court (or the probate court) to make such a finding.

A.   Competency to Participate in Treatment Decision

¶ 32    We agree with the probate court that the People satisfied the first *Medina* prong — that the patient is incompetent to make treatment decisions.  *Medina*, 705 P.2d at 973.  C.J.R.'s psychiatrist testified that C.J.R. does not have any insight into his condition; he has never acknowledged that he suffers from a mental illness; and instead, he believes that the psychiatrist has misdiagnosed him.  Because C.J.R.'s failure to recognize that he has a mental illness interferes with his ability to effectively participate in his treatment decisions, the record easily satisfies this element of *Medina*.  *See People in Interest of R.K.L.*, 2016 COA 84, ¶ 33.

B.   Long-Term Mental Deterioration or Likelihood of Harm

¶ 33    The second *Medina* element is also satisfied.  In considering this element, the court must determine "whether the proposed treatment is necessary either to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution."  *Medina*, 705 P.2d at 973.  This determination requires the consideration of one of two alternative factors.  *Id.*  The first factor is the patient's actual need for the

medication.  *Id.*  The second factor involves the physical safety of the patient and others.  *Id.*  In evaluating the second factor, the court must consider "the likelihood that the patient, due to his condition, will cause serious harm to himself or others in the institution" in the absence of the proposed treatment.  *Id.* at 974.

¶ 34     The psychiatrist testified that C.J.R.'s sexually inappropriate behavior had escalated since he had been taken off of Clozaril, to the point that he represented an ongoing risk of sexual assault to other patients and staff.  No other antipsychotic drugs seemed to have worked to reduce this behavior.  The psychiatrist recommended Depo-Provera because she thought that it could reduce C.J.R.'s libido and thus reduce the sexual assault risk that he posed.  The record therefore shows that C.J.R.'s condition is such that he likely constitutes a continuing and significant threat to the safety of others in the hospital in the absence of the proposed treatment.  *Id.* at 973-74.  *Medina*'s second element is thus met.

C.  No Less Intrusive Alternative

¶ 35     We hold, however, that the third *Medina* element — that there were no less intrusive treatment alternatives available, *id.* at 973 — does not find support in this record.  The third *Medina* element

"encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient's condition or of alleviating the danger created by that condition." *Id.* at 974. A "'less intrusive alternative' constitutes an available treatment that has less harmful side effects and is at least as effective at alleviating a patient's condition as the proposed treatment." *Strodtman*, 293 P.3d at 133.

¶ 36 We acknowledge that the treatment of C.J.R. is a challenge. He has already sexually assaulted one nurse, and we assume for these purposes that chemical castration of C.J.R. would decrease his sexually inappropriate behavior. But, in our view, the hospital has failed to establish by clear and convincing evidence that this treatment is the least intrusive way to manage his condition.

¶ 37 The psychiatrist testified that moving C.J.R. to an all-male ward might result in violent interactions with the other patients and sexual encounters with female nurses. But the record did not permit the probate court, and does not permit us, to determine why moving C.J.R. to an all-male ward — and, to the extent that he needs to have contact with female nurses, physically restraining

20

him from touching those nurses — is not a less intrusive way to alleviate the danger caused by his behavior. That course of action would prevent C.J.R. from frightening female patients and would accommodate C.J.R.'s objections to chemical castration.

¶ 38 Moreover, the psychiatrist testified that C.J.R. had been isolated in his own room to minimize contact with others before, but this had not "work[ed]" and she believed that it was more restrictive than administering the Depo-Provera. However, without any testimony regarding why confining him to his room was not a viable solution or why it was "more restrictive," it was not possible for the probate court, and it is not possible for us, to evaluate the gravity of any harmful effects from that course of action, or its feasibility and efficacy.

¶ 39 In view of such sparse evidence regarding these alternatives (or any others), the People failed to establish that no less intrusive treatment alternatives are available.

   D. Need for Medication Overrides Legitimate Reason to Refuse

¶ 40 We also conclude that the last *Medina* element is not satisfied. *Medina*'s fourth element evaluates whether the patient's need for treatment with medication is sufficiently compelling to override "any

bona fide and legitimate interest of the patient in refusing treatment." 705 P.2d at 973. A court first must determine whether the patient's refusal is bona fide and legitimate. If it is, the court must then determine "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient . . . and in protecting the safety of those in the institution." *Id.* at 974.

¶ 41 The psychiatrist's testimony and statements regarding the serious effects of Depo-Provera, including that it can "cause feminizing effects" in men, establishes that C.J.R.'s refusal is "bona fide and legitimate."

¶ 42 Certainly the state has a legitimate interest in protecting the safety of the other patients and the hospital's employees from C.J.R.'s threatening behavior (and protecting C.J.R. from other patients from whom he would face harm if he cannot control his behavior). But, on the skeletal record before us, we cannot conclude C.J.R.'s prognosis, without treatment, is so unfavorable that C.J.R.'s right to refuse the Depo-Provera is overridden by the state's desire to use the drug to control his inappropriate sexual

behavior, particularly when the People presented minimal information about the efficacy and likely success of the treatment, its long-term side effects and risks, and any treatment alternatives.[9]

¶ 43    The probate court also justified involuntary chemical castration on the basis that without it, C.J.R. would be subject to criminal charges for sexual assault, and the court did not know whether being forcibly medicated with Depo-Provera would be worse than being prosecuted for sexual assault.  We reject this rationale. Neither the probate court nor the People cited any authority to support that rationale, and we have found none.  In our view, such speculation substantially exceeds the proper function of a court.

¶ 44    Because the third and fourth *Medina* elements were not satisfied by clear and convincing evidence, the probate court's order

---

[9] The appellate record regarding the use, efficacy, side effects (such as physical changes to the body including the sex organs and the long-term risks of the drug causing serious diseases like cancer), dose, reversibility of the treatment, and other critical aspects of the use of Depo-Provera to decrease C.J.R.'s sexually inappropriate behavior is skeletal at best.  Indeed, the dissent appears to rely on law review articles to determine these matters, not expert testimony by qualified physicians or pharmacologists, or even medical journals, to support some of its conclusions.

authorizing the forced administration of Depo-Provera to C.J.R. cannot stand.[10]

## V. Conclusion

¶ 45 That part of the probate court's order authorizing the involuntary administration of Depo-Provera is reversed. That part of the order authorizing the use of a nasogastric tube to administer other medications is affirmed.

JUDGE ROMÁN concurs.

JUDGE BERNARD concurs in part and dissents in part.

---

[10] The basis on which C.J.R. challenges the probate court's order to administer other medications, if necessary, through a nasogastric tube is unclear. We conclude that the probate court's order authorizing the use of a nasogastric tube, if necessary to administer medications other than Depo-Provera, is governed by *Medina* and the record supports that the *Medina* factors were satisfied as to this request.

24

JUDGE BERNARD, concurring in part and dissenting in part.

¶ 46     There are two competing imperatives in this case. The majority focuses on a strong moral imperative: that C.J.R.'s human dignity will be compromised because he will be treated, against his will, with a strong drug that has potentially feminizing side effects. I rely on what I believe is a strong legal imperative: that the four-factor test found in *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985), controls the analysis in this case.

¶ 47     As the reader will be able to tell from the majority opinion and from the dissent, these two imperatives pull strongly in opposite directions. I have empathy for C.J.R., but I also think that the probate court properly applied the existing law. I am concerned that the majority's desire to accommodate C.J.R.'s moral imperative will draw a tight perimeter around *Medina*, limiting its use primarily to doctors' requests to treat patients with antipsychotic drugs. In doing so, the majority opinion could alter the way that we analyze the requests of doctors to treat incompetent patients against their will with drugs or technologies that do not fall within that tight perimeter.

¶ 48    And I am also concerned about something else because there is a second moral imperative in this case that is aligned with the legal one.  Because of his mental illness, C.J.R. is dangerous.  And, by only heeding *his* moral imperative, I am concerned that the majority gives short shrift to the moral imperative of protecting other patients and the staff at the Colorado Mental Health Institute at Fort Logan, where C.J.R. is hospitalized.

¶ 49    So, even if I did not have the legal imperative of *Medina* to support my position, I would still dissent because I think that the moral imperative of protecting those people has more persuasive force than the moral imperative of saving C.J.R. from a potent drug that he does not want to take.

¶ 50    I concur with the majority's decision to affirm the probate court's order that allowed the staff at the Institute to administer medication to C.J.R. through a nasogastric tube.  But I respectfully dissent from the majority's decision to reverse the probate court's order that allowed the Institute to treat C.J.R. against his will with Depo-Provera.

I.  "We have often noted that issues not presented to or raised in the trial court will not, as a general matter, be considered on appeal."

— *Roberts v. Am. Family Mut. Ins. Co.*, 144 P.3d 546, 549 (Colo. 2006)

¶ 51    The majority asserts that the "threshold question" in this case is "whether *Medina* applies to a request to involuntarily administer" Depo-Provera "as part of the treatment for a mentally ill, male patient at a state hospital for the express purpose of controlling his sexually inappropriate behavior."

¶ 52    This statement in the majority's opinion is the *first* time that *this* question has appeared in this case.  Neither of the parties raised that issue in the trial court.  Instead, both sides contended that *Medina* applied, although they disagreed about whether *Medina*'s four-factor test had been satisfied.  The probate court thought that *Medina* applied.  And both parties contended on appeal that *Medina* applied, although they again disagreed about whether it had been satisfied.  The first time that the parties faced the issue of whether *Medina* applied to this case was when we asked them for supplemental briefs after C.J.R. had filed his reply brief.

¶ 53    Unlike the majority, I would not pose a question that was never asked of the trial court in this case and then answer it.  *See*

*Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992) ("Arguments never presented to, considered or ruled upon by a trial court may not be raised for the first time on appeal.").

¶ 54    In response, the majority asserts that C.A.R. 1(d) supports its decision to analyze this issue.  I question whether it is a good idea to do so in a case in which neither of the parties had raised the issue *at any point of the proceedings* until we asked them for supplemental briefs.  As our supreme court has pointed out, appellate courts generally decline to resolve issues that the parties have not addressed in their briefs or during their arguments. *Moody v. People*, 159 P.3d 611, 614 (Colo. 2007).  "Such self-restraint is derived from the contours of our adversarial system [because] 'appellate courts do not sit as self-directed boards of legal inquiry and research . . . .'" *Id.* (quoting *Rose v. United States*, 629 A.2d 526, 536-37 (D.C. 1993)).  Appellate courts are instead "arbiters of legal questions presented and argued by the parties before them."  *Id.* (quoting *Rose*, 629 A.2d at 536-37).

¶ 55    But, since the majority has raised this question and provided its own answer, I will provide mine below.

## II. "After a century of studying schizophrenia, the cause of the disorder remains unknown."

— Dr. Thomas R. Insel, Neuroscientist, Psychiatrist, and Head of the National Institute of Mental Health from 2002 to 2015, *Rethinking Schizophrenia*, https://perma.cc/8HG9-TXA7

¶ 56    No one really knows what causes schizophrenia and its related psychotic conditions. "Researchers believe that a number of genetic and environmental factors contribute to causation, and life stresses may play a role in the disorder's onset and course." American Psychiatric Association, *What is Schizophrenia?*, https://perma.cc/JAY2-PKT4. "Since multiple factors may contribute, scientists cannot yet be specific about the exact cause in individual cases." *Id.* Researchers offer several major theories of causality: genetics; environmental factors, such as viruses or malnutrition; imbalances in brain chemistry; and substance abuse. National Alliance on Mental Illness, *Schizophrenia*, https://perma.cc/7KDY-NZKZ; *see also* National Institute of Mental Health, *Schizophrenia*, https://perma.cc/DH2U-VLB8.

¶ 57    People with schizophrenia and related disorders suffer a variety of symptoms, including delusions, hallucinations, and disorganized thinking. American Psychiatric Association, *Diagnostic*

29

*and Statistical Manual of Mental Disorders* 87-88, 99 (5th ed. 2013)(*DSM-V*). There is no known cure. American Psychiatric Association, *What is Schizophrenia?*; National Alliance on Mental Illness, *Schizophrenia.*

¶ 58    Even though schizophrenia and its related disorders are incurable, they can be treated. One major form of treatment is antipsychotic medication. American Psychiatric Association, *What is Schizophrenia?* These drugs work well for some people, reducing the frequency of the disorder's symptoms and the incidence of relapses, so that they can live "highly productive and rewarding lives." *Id.*

¶ 59    C.J.R. is not one of those people. He is sixty years old, and he has been hospitalized, mostly at the Institute, for the last twenty-four years. Doctors have diagnosed him as suffering from schizophrenia or schizoaffective disorder for this entire time. (A person who suffers from schizoaffective disorder shows both psychotic symptoms and a mood disorder, such as depression or mania. *DSM-V* at 105-07.)

¶ 60    He has hallucinated about dead babies. He has expressed the general belief — a delusion — that his food and his medicine have

30

been contaminated and the specific delusion that there have been gonorrhea "germs" in his food and in his medicine. His psychiatrist believes that he "continues to show disorganized thinking, speech and behavior."

¶ 61 C.J.R. does not have any insight into his condition. He has never told his psychiatrist, who has treated him for the last eight years, that he realizes that he suffers from a mental illness. Instead, he says that she has misdiagnosed him.

¶ 62 The psychiatrist has tried to talk with him about the benefits, risks, and potential alternatives to the medication that has been prescribed for him. He sometimes refused to have these discussions, and he sometimes said that he did not see that the medications had any benefits and that they offered only risks. Over the years, he has made it clear to the psychiatrist that (1) he did not "agree with the medications"; (2) he did not accept the validity of prior court orders that authorized the psychiatrist and the staff to administer medication to him against his will; and (3) he would refuse the medication if "given the choice." He "regularly refused" medications "in defiance" of court orders.

¶ 63    He does not want to take his medications because he does not think that they help him.  But, according to a letter that the psychiatrist wrote to the probate court, "when [he] receives medications on a more consistent basis, his level of functioning is better and his symptoms are less; when he refuses medication, he struggles more, and his symptoms appear to increase."  And his delusion that his food and his medicine are contaminated leads him to refuse them both.

¶ 64    This lack of insight is not unusual.  "Some individuals with psychosis may lack insight or awareness of their disorder," which may extend to a lack of awareness of schizophrenia's symptoms. *DSM-V* at 101.  "Unawareness of illness is typically a symptom of schizophrenia itself rather than a coping strategy."  *Id.*

¶ 65    C.J.R. is given a lot of medication, which falls into four general categories: antipsychotic drugs, mood stabilizers, anti-anxiety medicines, and medication to treat the side effects associated with antipsychotic drugs.  The Institute's staff tests him frequently to determine whether his medication remains at therapeutic levels in his system and to monitor its side effects.  The goal of these tests is to ensure that his medications are administered safely.

¶ 66    C.J.R.'s behavior has been troublesome for a long time.  For example, when doctors tried to wean him off of Clozaril, the antipsychotic drug that he had taken for a long time, the results were "disastrous."  He became aggressive and assaultive, and he damaged property.  According to the psychiatrist, "[h]istorically, he has been quite violent when not taking regular medication."

¶ 67    He has also engaged in sexually inappropriate behavior.  He has often emerged naked from his room into the ward, where there are both men and women.  He has masturbated in front of members of the Institute's staff.  But he would normally comply when a staff member told him to put on clothes.

¶ 68    "[N]ormally comply" is now a concept that belongs to the past tense.  His behavior has recently crossed the line from troublesome to threatening.

¶ 69    He sexually assaulted a nurse in early May 2016, grabbing her breasts and her genital area.  He "repeatedly and inappropriately solicited staff members for sex."  He walked naked through the common areas of the ward, where his nudity traumatized vulnerable female patients, and he refused to put on clothes.  He

became more physically aggressive, "punching, kicking, [and] scratching" staff members.

¶ 70    C.J.R.'s psychiatrist said that he now hears voices, which she called command hallucinations, almost every day. The voices tell him to be naked and to have sex with other people.

¶ 71    These changes appear to be related to a change in C.J.R.'s medication. The Institute's staff had begun treating him with Clozaril in 1996, and the psychiatrist thought that it had helped to control his sexually inappropriate behavior. But, in February of 2016, he had a grand mal seizure, and he was transported to a Denver hospital. Subsequent testing showed that the Clozaril level in his blood had risen above therapeutic levels, even though testing the week before had shown that the drug's level was within therapeutic limits. The doctors at the Denver hospital "highly suspected" that the elevated Clozaril levels had caused the seizure. And, somehow, C.J.R.'s ability to metabolize Clozaril could have changed, so it was unclear whether he could still be treated with that drug. He remained in the Denver hospital until the end of March. The doctors there prescribed anti-seizure medicine for him,

which the Institute's staff continued to administer after he returned.

¶ 72     C.J.R.'s sexually inappropriate behavior got worse when he returned to the Institute after his seizure, even though the psychiatrist treated him with two other antipsychotic drugs, Prolixin and olanzapine.

> III.  "Antipsychotic medications, either alone or in combination, can cause numerous and varied side effects and carry with them the risk of serious and possibly permanent disabilities in the patient."
>
> — *Medina*, 705 P.2d at 968

¶ 73     The potential side effects associated with antipsychotic drugs are no picnic.  "Metabolic, neuromuscular and cardiovascular side effects are common in patients receiving antipsychotic medications for any indication . . . ."  American Psychiatric Association, *Choosing Wisely*, https://perma.cc/P342-J93L.  More prosaically, those symptoms include drowsiness, dizziness, restlessness, weight gain, dry mouth, constipation, nausea, vomiting, blurred vision, low blood pressure, uncontrollable movements ("such as tics and tremors"), seizures, and "a low number of white blood cells which fight infections".  National Institute on Mental Health, *Mental Health Medications*, https://perma.cc/7WD8-PXXJ.  Some antipsychotic

medications cause rigidity, persistent muscle spasms, and tremors. *Id.* Long-term use of certain antipsychotic drugs can lead to tardive dyskinesia, a potentially permanent condition that causes involuntary muscle movement. *Id.*

¶ 74 Depo-Provera can cause serious side effects in men. According to C.J.R.'s psychiatrist, it can, among other things, feminize a man's appearance, decrease muscle mass, shrink testicles, lower sperm count, cause erectile dysfunction, lead to the development of female-like breasts, and bring on osteoporosis.

¶ 75 But both types of drugs have upsides. As I have indicated above, antipsychotics are used to treat the symptoms of schizophrenia. Depo-Provera contains a female hormone that is used in some birth-control drugs. The psychiatrist said that there was "considerable clinical evidence" that Depo-Provera "reduced libido, and, given [C.J.R.'s] hypersexual behavior," this drug could "help him manage his sexual urges."

¶ 76 The Institute's staff would administer the Depo-Provera to C.J.R. by injection, and one injection would last ninety days. The psychiatrist thought that she would know whether the Depo-Provera was having its desired effect during the ninety-day

period. (There is no indication in the record that this course of treatment could or would effect a gender reassignment.)

¶ 77 The psychiatrist added that the Institute's staff would monitor C.J.R. regularly to watch for Depo-Provera's side effects. She thought that the purpose of administering the Depo-Provera to C.J.R. was to prevent his behavior that was "dangerous to others." She did not know whether it would prevent a long-term deterioration of his mental condition.

## IV. "Some griefs are medicinable."

— William Shakespeare, *Cymbeline* act III, sc. 2

¶ 78 The four-part *Medina* test does not only apply to antipsychotic drugs. It comes from a broader background, and it has been applied to other kinds of treatment.

- *Medina* states that incompetent patients "have the right under appropriate circumstances to legitimately refuse *treatment* that poses a significant risk to their physical well-being," 705 P.2d at 967 (emphasis added).

- *Goedecke v. State, Department of Institutions*, 198 Colo. 407, 411, 603 P.2d 123, 125 (1979), a case upon which the supreme court relied heavily in *Medina*, observed that

37

Colorado courts have historically "acknowledged" that doctors must obtain a competent patient's informed consent "for treatment with *drugs* having possible harmful side effects." (Emphasis added.)

- Section 27-65-111(5)(a), C.R.S. 2015, states that a probate court may "enter an order requiring that . . . [a] person accept such *treatment* or, in the alternative, that the *medication* be forcibly administered." (Emphasis added.)

- A division of this court held that it was appropriate for a probate court to rely on the *Medina* factors when evaluating whether to grant a hospital's request to force an incompetent patient to undergo electroconvulsive therapy, *see People in Interest of M.K.M.*, 765 P.2d 1075, 1076 (Colo. App. 1988).

¶ 79 Turning now to the four *Medina* factors, 705 P.2d at 973, I resolve them as follows.

¶ 80 *Was C.J.R. incompetent to participate effectively in the treatment decision?* He concedes on appeal that he was incompetent.

¶ 81 Was the Depo-Provera treatment necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood that the patient will cause serious harm to himself or others in the institution? C.J.R. concedes part of the second Medina factor — the likelihood that he will cause serious harm to himself or others in the institution — because he agrees that "he becomes aggressive and assaultive when [he is] not controlled through medication." But he contends that the record does not support the probate court's decision that Depo-Provera was necessary to prevent his aggressive and assaultive behavior.

¶ 82 Much of C.J.R.'s focus when discussing the probate court's application of Medina is on what he characterizes as a sufficiency-of-the-evidence problem that is based on an absence of information in the record. He points out that the record does not show whether the side effects associated with Depo-Provera are likely or unlikely to occur. He contrasts the state of the record in this case with the state of the record in Medina, in which there was substantial testimony about the side effects of the antipsychotic

drug that was the focus of that case. He states that the record does not show whether Depo-Provera is an antipsychotic drug.

¶ 83    I disagree with C.J.R.'s contentions for the following three reasons.

¶ 84    First, I reject his assertion that we must reverse the probate court's order because the record does not establish that Depo-Provera "is an antipsychotic medication" or that the drug will "address[]" his "psychotic behavior." Rather, I think that this assertion is a red herring.

¶ 85    As I have indicated above, I believe that the pertinent law in Colorado focuses on any involuntary treatment that has the potential for serious side effects. *See Medina*, 705 P.2d at 967; *Goedecke*, 198 Colo. at 411, 603 P.2d at 125; *M.K.M.*, 765 P.2d at 1076. And the supreme court has recognized that antipsychotic drugs are powerful; that they can cause serious, perhaps permanent side effects; that they are "far more debilitating" than a patient's involuntary commitment to a treatment facility; and that their beneficial side effects are evanescent, lapsing after they leave the patient's blood stream. *Medina*, 705 P.2d at 968-69.

¶ 86     I conclude that the probate court, when its analysis equated Depo-Provera with an antipsychotic drug, recognized that Depo-Provera was powerful and that its use posed the risk of significant, potentially harmful side effects.  In other words, by applying *Medina,* the probate court treated the psychiatrist's request to use Depo-Provera with the seriousness that our supreme court expects when the potential of involuntary treatment with a powerful drug looms over an incompetent patient.

¶ 87     Second, while I agree with C.J.R.'s contention that the record does not establish the *likelihood* that he will suffer one or more of the side effects associated with Depo-Provera, I disagree with him over how important that missing information was.  Although the psychiatrist did not testify to statistical likelihoods, she clearly listed some of the potential side effects.  While they are indeed serious and significant, the probate court knew that they were possibilities.  And it appears that the court assumed that C.J.R. would suffer from any or all of them: the court wrote in its order that C.J.R.'s "valid objections to the feminizing side effects of Depo-Provera [were] overridden by the [hospital's] compelling interest[]" in "assur[ing] the safety of all concerned."

41

¶ 88    Third, C.J.R. points to out-of-state authority concerning Depo-Provera, which states that it has been used as a mode of "chemical castration" for sexually violent felons.  But these cases do not help him.  *People v. Collins*, 1 Cal. Rptr. 3d 641, 646 (Cal. Ct. App. 2003), observed that a man who had been involuntarily hospitalized in a civil proceeding because he was a sexually violent felon had been treated with Depo-Provera.  The opinion did not discuss the drug's risks, and it did not suggest that the drug's use had been inappropriate.

¶ 89    But *Collins did* cite a law review article that discussed the pros and cons of using Depo-Provera.  Peter J. Gimino III, Comment, *Mandatory Chemical Castration for Perpetrators of Sex Offenses Against Children: Following California's Lead*, 25 Pepp. L. Rev. 67 (1997).  Although the author recognized that Depo-Provera had significant side effects, *id.* at 73-76, he added that "[m]ost reported side effects rarely occur, . . . and they are all reversible after . . . treatment is terminated," *id.* at 75.

¶ 90    The author of another law review article that I have found noted that, although Depo-Provera has "significant side effects," it may "significantly reduce recidivism rates in certain male offenders"

by "reducing testosterone production and consequently the offender's sex drive." Zachary Edmonds Oswald, Note, *"Off With His ___": Analyzing the Sex Disparity in Chemical Castration Sentences*, 19 Mich. J. Gender & L. 471, 477 (2013). (I acknowledge that the Food and Drug Administration has "recommended that Depo-[P]rovera only be taken for up to two years because extended use results in loss of bone density and other severe side effects." Haley A. Smith, Comment, *Common Enemy and Political Opportunity Leave Archaically Modern Sentencing Unchecked: The Unconstitutionality of Louisiana's Chemical Castration Statute*, 59 Loy. L. Rev. 211, 236 n.136 (2013).)

¶ 91    C.J.R. also cited *Tran v. State*, 965 So. 2d 226 (Fla. Dist. Ct. App. 2007). But that opinion did not discuss the risks or benefits of Depo-Provera. It concluded, instead, that a court had violated the Constitution's Double Jeopardy Clause when it ordered a defendant in a criminal case to undergo therapy with that drug several months after the court had imposed sentence.

¶ 92    Likewise, *Vandyne v. State*, No. 10-07-00328-CR (Tex. App. May 27, 2009)(unpublished opinion), did not analyze the risks that

Depo-Provera posed. Although the opinion referred to chemical castration, it did not mention Depo-Provera.

¶ 93    Turning to the majority opinion, it makes much of the decision by Colorado's legislature to reject a "chemical castration" law. But I submit that the legislature's action in this area means comparatively little to this case because we really do not know why the legislature rejected the law. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 558 (1993)(Scalia, J., concurring in part and concurring in the judgment)("[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body, and this Court has a long tradition of refraining from such inquiries.")(citations omitted).

¶ 94    I also submit that there is little persuasive force propelling the majority's statement that the legislature's decision "declin[ing] to authorize chemical castration for persons convicted of criminal offenses" leads to the conclusion that Colorado courts "do not have the authority to order chemical castration as part of the mental health treatment of a civilly committed patient." The legislature has not passed a statute *banning* chemical castration; neither our supreme court nor a division of this court have previously offered

any opinion, either positive or negative, about the practice; and the majority does not point to a decision from another jurisdiction that declares the practice to be unconstitutional.

¶ 95    And I question the utility of the comparison of the process of chemical castration in criminal cases to C.J.R.'s case.  Convicted defendants in criminal cases are, by definition, competent; C.J.R. is not.  Convicted defendants have made conscious choices to break the law; C.J.R.'s choices are driven by his mental illness.  Chemical castration is ordered for convicted defendants who will live in the community — not in prison — on probation or on parole; C.J.R. has been hospitalized for over two decades.  Chemical castration may be imposed in a criminal case as a form of punishment; Depo-Provera is used in this case as a form of treatment.  In other words, C.J.R.'s behavior poses an entirely different set of questions than the behavior of convicted defendants does.

¶ 96    The majority also submits that my analysis supports the physical castration of patients and that it conjures up "visions of involuntary lobotomies."  But this case is not about either of those irreversible things.  And I suggest that the majority's reference to this parade of horribles introduces into this appeal issues that, akin

to the question the majority chooses to raise and to answer sua sponte, are not before us.

¶ 97    I also disagree with the majority's assertion that the use of Depo-Provera in this case is not treatment because its sole purpose would be to moderate C.J.R.'s behavior.  Controlling problematic behavior *is* a form of treatment.  For example, one of the reasons that the doctors in *Medina* wanted to use antipsychotic drugs to treat him was that he "sometimes [became] assaultive . . . and occasionally attack[ed] others or [threw] furniture and other objects around the mental health facility."  705 P.2d at 964.  The doctors thought that the drugs would "alleviate these symptoms."  *Id.*  A doctor testified that the medication had "decreased the incidents of assaultive behavior."  *Id.*

¶ 98    C.J.R.'s inappropriate sexual behavior is as much a "symptom" of his disease as Mr. Medina's violence was of his.  The Depo-Provera that the Institute wants to administer to C.J.R. is designed to "alleviate" that symptom.

¶ 99    Turning now to the specific analysis of the second *Medina* factor, I conclude that the record supports the probate court's determination, by clear and convincing evidence, that Depo-Provera

was necessary to prevent C.J.R.'s aggressive and assaultive behavior. The psychiatrist testified that C.J.R.'s sexually inappropriate behavior had escalated since he had been taken off of Clozaril to the point that he represented an ongoing risk of sexual assault to other patients and staff. No other antipsychotic drugs seemed to have worked to mediate his behavior. The psychiatrist recommended Depo-Provera because she thought it could reduce C.J.R.'s libido and thus reduce the sexual assault risk that he posed.

¶ 100    *Is a less intrusive treatment alternative available?* I also conclude that the record supports the probate court's determination, by clear and convincing evidence, that there were no less intrusive treatment alternatives available. The psychiatrist had considered and rejected alternatives. She could put C.J.R. in another ward with just men, but she feared that their response to his sexually inappropriate behavior would be to assault him. He would also pose a risk to the female staff members who worked on the all-male ward. She could isolate him, minimizing his contact with others, but she had tried that solution before, and it did not

47

"work." She thought the resulting seclusion was more restrictive than the Depo-Provera.

¶ 101 I could, of course, speculate that there are other alternatives. Perhaps the Institute could, as the majority suggests, "physically restrain [C.J.R.] from touching . . . female nurses." But how would the Institute do that? Would it have to assign a full-time staff member to watch C.J.R. and to restrain him at appropriate times? Would the Institute have to tie him up? I do not know what the Institute's budgetary considerations are, so I do not know whether it can afford to give C.J.R. a babysitter who, as a result of that assignment, cannot spend time with other patients. And I do not know how C.J.R. would react to being physically restrained.

¶ 102 I only have before me the psychiatrist's testimony, and I submit that we should take her at her word. She has treated C.J.R. at the Institute for eight years. She is the expert who understands him, his care, and his reaction to circumstances, such as isolation; she is the expert who knows what the Institute's staff can do; and she is the expert who can evaluate the risks that C.J.R. presents to others, and the risks that others present to him.

¶ 103    Is the patient's need for treatment sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment?  I conclude that the record supports the probate court's determination, by clear and convincing evidence, that C.J.R.'s need for treatment with Depo-Provera was sufficiently compelling to override his bona fide and legitimate interest in refusing treatment.

¶ 104    The psychiatrist testified that C.J.R.'s behavior had escalated into a dangerous, criminal place.  He daily heard voices that instructed him to take off his clothes and to have sex with other people.  The psychiatrist's testimony described the prospect of more sexual assaults on additional people.  Such an outcome would not only create problems for those potential victims, but it could also lead to criminal charges being filed against C.J.R. or to other patients assaulting him.  And she observed that, historically, he was "quite violent" when the Institute's staff tried to wean him off of Clozaril.  These are certainly compelling circumstances.

¶ 105    I do not minimize Depo-Provera's significant side effects; it is very strong medicine.  But antipsychotic drugs are also very strong medicines that can have significant side effects.  As *Medina* makes

clear, there are circumstances in which it is appropriate to administer strong medicines to incompetent patients without their consent.

¶ 106 Antipsychotic medicines affect the human brain, which is the very center of what we perceive, what we think, what we feel, and who we are. I have trouble seeing how Depo-Provera presents a greater risk to C.J.R.'s well-being or to his sense of self than antipsychotic drugs. If courts can grant doctors' requests to administer antipsychotic drugs to incompetent patients that will directly affect their brains, I do not understand why they cannot, following *Medina*, grant requests to administer Depo-Provera to those patients that will directly affect their brains or other parts of their bodies. I therefore think that distinguishing between antipsychotic drugs and Depo-Provera in this case creates a false dichotomy. They are both treatments as far as C.J.R. is concerned, and their use against his will is subject to *Medina*.

¶ 107 I think that C.J.R.'s desire to avoid the potentially feminizing effects of Depo-Provera is certainly understandable and reasonable. But this case, much like *Medina*, presents us with one of those choices between unattractive alternatives that the law sometimes

requires.  I conclude that the probate court chose the "least bad" alternative and that, based on *Medina* and the record, it was the right choice to make.